CAROLE W. BRIGGS *v.* HONORABLE
ROBERT F. MCWEENY
(SC 16515)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.

Argued December 4, 2001—officially released May 21, 2002

*Ralph G. Elliot,* for the plaintiff in error.

*Eliot D. Prescott,* assistant attorney general, with whom were *Jane R. Rosenberg,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, for the defendant in error.

*Opinion*

ZARELLA, J. This case is before us on a writ of error brought by the plaintiff in error, Carole W. Briggs (plaintiff), an attorney. The plaintiff claims that the defendant in error, Honorable Robert F. McWeeny,[1] improperly found, in the absence of clear and convincing evidence, that the plaintiff had violated subdivisions (1) and (6) of rule 3.4[2] of the Rules

---

[1] In this opinion, we refer to the defendant in error interchangeably as the trial court and Judge McWeeny.

[2] Rule 3.4 of the Rules of Professional Conduct provides in relevant part: "A lawyer shall not:

"(1) Unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act;

"(2) Falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law . . .

"(6) Request a person other than a client to refrain from voluntarily giving relevant information to another party unless:

"(A) The person is a relative or an employee or other agent of a client; and

"(B) The lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information. . . ."

of Professional Conduct[3] and that the trial court's imposition of a sanction upon the plaintiff violated her due process rights under the state and federal constitutions. The plaintiff seeks reversal of the trial court's findings of misconduct and the order disqualifying her from representing Amity Regional School District Number 5 (Amity) in litigation arising from a school renovation project (renovation project). We find no error.

The record discloses the following procedural history and relevant facts. In the early 1990s, Amity undertook an extensive renovation of Amity Regional Senior High School (high school) in Woodbridge and hired Atlas Construction Company (Atlas) as the general contractor for the renovation project. The renovation project was substantially completed in 1995. Thereafter, in 1997, Atlas brought an action against Amity seeking damages in excess of five million dollars. Amity, in turn, filed an action against Atlas and several other contractors that had worked on the renovation project, alleging breach of contract and negligence.[4] The plaintiff represented Amity in each of those actions before the trial court, *McWeeny, J.*[5]

In 1999, Atlas served Amity with a set of interrogatories in connection with the Amity-Atlas litigation. Those

---

[3] "The [r]ules contained in the Rules of Professional Conduct as adopted by the American Bar Association and as recommended, with revisions, by the Connecticut Bar Association for adoption were approved by the judges of the superior court, effective October 1, 1986." Preface to the Rules of Professional Conduct, in Practice Book (2002) p. 1.

[4] We hereinafter refer to the action that Amity brought against Atlas and other contractors as the Amity-Atlas litigation.

[5] The plaintiff had counseled Amity since the late 1980s on a variety of issues, including those related to facilities management and school construction projects. Thus, the trial court found that the plaintiff "has been intimately involved in Amity's miscellaneous repair and maintenance projects [and] the procurement of outside contractors . . . ." Along with her paralegal, Eileen Miller, the plaintiff has assisted Amity in drafting, soliciting and reviewing proposals for services and requests from outside contractors to provide services.

interrogatories included a request to identify all reports, analyses and tests related in any way to the exterior wall system, fungus or mold at the high school. The plaintiff responded to the interrogatories and signed them without objecting to that specific request.

Thereafter, in August, 2000, Amity undertook a repair and maintenance project at the high school and awarded various service contracts in connection with the project. Amity did not award a contract for miscellaneous general carpentry services, however, owing to the fact that Amity had received no formal bids for that particular contract. Paul DiSpazio, president of DiSpazio Corporation, informed Gerry Keane, the on-site property manager at the high school,[6] that he was interested in the contract. Vincent Grignano, Amity's director of financial services, awarded the contract to DiSpazio in August, 2000. Under the contract, DiSpazio was responsible for replacing sagging tiles in the high school's suspended ceiling system.

At an August 16, 2000 meeting, at which the plaintiff was present, DiSpazio sought and obtained Keane's authorization to obtain an engineering study on the ceiling problems at the high school. DiSpazio later confirmed Keane's authorization in writing. DiSpazio hired Martin Benassi, an architect, to conduct the study. In his report, Benassi noted sagging and molding ceiling tiles and the presence of water stains. Benassi attributed the conditions to the maintenance practices and humidity levels at the high school. These conclusions contradicted the opinions of Amity's expert witnesses and, thus, were harmful to Amity's claims in the Amity-Atlas litigation.

Sometime after receiving Benassi's report, DiSpazio forwarded it to Keane. At an August 29, 2000 meeting

---

[6] Keane was employed by ServiceMaster Corporation, Amity's long-standing manager of school properties.

of Amity's facilities committee, Keane distributed copies of Benassi's report to committee members, the plaintiff and Eileen Miller, the plaintiff's paralegal. Miller reviewed the report and, following a discussion between the plaintiff and Miller, the plaintiff collected and retained all of the distributed copies. The plaintiff informed Keane that she was very upset about the existence of Benassi's report inasmuch as it would have a detrimental effect on Amity's position in the Amity-Atlas litigation. She also indicated that the report would have a financially adverse impact on Amity.

On September 12, 2000, the plaintiff held a meeting to discuss Benassi's report, at which Keane, DiSpazio, Miller, and Russell Faroni, chairman of Amity's facilities committee, were present. The plaintiff asked DiSpazio to withdraw the report. DiSpazio refused and essentially stated that he would not participate in a cover-up. In response to the plaintiff's question whether Benassi's report was merely a draft, DiSpazio indicated that the report was not a draft, but a final report. Thereafter, the meeting evolved into a heated exchange between the plaintiff and DiSpazio. The plaintiff instructed DiSpazio to treat their exchange as confidential, and DiSpazio told her to contact his attorney.

After the meeting, DiSpazio met with his attorney, Joseph Yamin, to discuss what had transpired. Yamin thereafter wrote a letter to Grignano, in which he stated: "This morning Mr. DiSpazio met with [the plaintiff] to discuss the [p]roject. Apparently, [the plaintiff] is upset with Mr. Benassi's report and the work being performed by DiSpazio. Obviously, Mr. Benassi has identified certain safety and aesthetic issues, which DiSpazio is addressing at the [s]chool. In no way . . . did Mr. Benassi or Mr. DiSpazio intend to address or interfere with any issues presently being litigated. Yet, similarly, DiSpazio does not intend to instruct Mr. Benassi to

modify his report nor will [he] release the report to any third parties unless lawfully required to do so."

On September 14, 2000, the plaintiff spoke with Yamin by telephone and demanded that DiSpazio withdraw Benassi's report because it was inconsistent with two other expert reports in the plaintiff's possession. The plaintiff further directed DiSpazio to have Benassi draft a revised report and submit it to her for approval before submitting it to Amity. Yamin informed the plaintiff that DiSpazio would not withdraw Benassi's report.

Thereafter, in a September 20, 2000 letter addressed to DiSpazio and Yamin, the plaintiff advised DiSpazio and Yamin that Benassi's report had been disclosed anonymously to the press notwithstanding Yamin's earlier assurance that DiSpazio would not release the report unless lawfully required to do so. The plaintiff wrote: "I made it very clear in our meeting that [Benassi's report] was not to be discussed with anyone who was not at the meeting." In the letter, the plaintiff sought confirmation from Yamin that DiSpazio would act in a manner that would protect Amity's right of confidentiality. In closing, the plaintiff informed Yamin and DiSpazio that, if she did not receive the requested assurance by the end of the business day, Amity would resort to the legal process to protect its interests.

On October 11, 2000, the New Haven Register published an article in which Benassi's report was discussed. Immediately thereafter, counsel representing Atlas requested copies of the report and any correspondence between the plaintiff and the Amity school board concerning the report.[7] The following day, the plaintiff

---

[7] The facsimiled request provided in relevant part: "Please, under our continuing duty to disclose and the articulation of damages concept, make available to me forthwith a copy of the DiSpazio report in the original form [in which] it was presented to the school officials in August 2000 and any and all correspondence by and between you and/or the School Board concerning the report or the subject of the report."

responded that she would disclose "all unprivileged relevant documents . . . in a timely manner." On October 16, 2000, Atlas' counsel sought to discover Benassi's report and any related notes or correspondence by issuing a notice of deposition for October 19, 2000, to DiSpazio Corporation's records custodian. On October 18, 2000, the plaintiff moved to quash the notice of deposition and sought a protective order. The plaintiff thereafter withdrew her motions, however, after learning that DiSpazio Corporation did not possess notes of the September 12, 2000 meeting. Yamin released Benassi's report to Atlas' counsel on October 20, 2000.

At an October 30, 2000 hearing on Amity's application for a prejudgment remedy in the Amity-Atlas litigation, Atlas, among others, notified the trial court of the plaintiff's efforts to suppress and to alter Benassi's report. After learning of these allegations, the trial court scheduled a hearing on the matter. In its order regarding the hearing on the allegations of misconduct, the trial court identified subdivisions (1), (2) and (6) of rule 3.4 of the Rules of Professional Conduct as relevant to the inquiry. The order further provided that the trial court would "entertain any motions relating to th[e] proceeding, including motions for sanctions, penalty, nonsuit or other disciplinary action against Amity and/or its counsel, [the plaintiff]." Subsequent to the issuance of the foregoing order, the plaintiff disclosed Benassi's report on December 6, 2000, as part of the scheduled document production in the Amity-Atlas litigation.

The trial court held the hearing on the allegations of misconduct on December 12 and 13, 2000, and January 29, 2001. Following the hearing, at which the trial court received extensive testimonial and documentary evidence, the court issued a thorough twenty-four page memorandum of decision in which it concluded that the plaintiff had violated rule 3.4 (1) and (6) of the Rules of Professional Conduct, but that the evidence

was insufficient to support a finding of a violation of rule 3.4 (2).

The trial court concluded, with respect to rule 3.4 (1), that Benassi's report was a document with potential evidentiary value because the existence of mold on the ceiling tiles and cause thereof were significant issues in the Amity-Atlas litigation. The trial court rejected the plaintiff's characterization of her efforts to have Benassi's report withdrawn as an attempt to shield Amity from embarrassment lest the report could become public pursuant to a request under the Freedom of Information Act, General Statutes § 1-200 et seq. The trial court concluded that the plaintiff's attempt to have Benassi's "report withdrawn or treated as a draft" had amounted to "an effort to 'alter, destroy or conceal' " a document having potential evidentiary value. The trial court further concluded that the plaintiff had violated the prohibition in rule 3.4 (1) against unlawfully obstructing another party's access to evidence inasmuch as the plaintiff had failed to disclose Benassi's report promptly, upon request, in disregard of her continuing duty to disclose under Practice Book § 13-15.[8]

The trial court did not find any evidence that the plaintiff had altered Benassi's report in any way. The trial court found the evidence insufficient to establish that Amity had terminated its contract with DiSpazio Corporation because DiSpazio had refused to withdraw Benassi's report. The trial court concluded, therefore,

[8] Practice Book § 13-15 provides: "If, subsequent to compliance with any request or order for discovery and prior to or during trial, a party discovers additional or new material or information previously requested and ordered subject to discovery or inspection or discovers that the prior compliance was totally or partially incorrect or, though correct when made, is no longer true and the circumstances are such that a failure to amend the compliance is in substance a knowing concealment, that party shall promptly notify the other party, or the other party's attorney, and file and serve in accordance with Sections 10-12 through 10-17 a supplemental or corrected compliance."

that there was insufficient evidence that the plaintiff had violated rule 3.4 (2).

The trial court further concluded that the plaintiff's instruction to DiSpazio at the September 12, 2000 meeting not to discuss Benassi's report with anyone and the plaintiff's September 20, 2000 letter reiterating her instruction had constituted a violation of rule 3.4 (6). The trial court rejected the plaintiff's claim that the rule was inapplicable because DiSpazio was a former agent of Amity. The trial court noted that Benassi's report was not confidential and, therefore, was discoverable by the defendants in the Amity-Atlas litigation. The trial court concluded by inviting all parties to submit a memorandum of law and "evidence" on the sanction to be imposed on the plaintiff.

After the trial court issued its decision on the allegations of misconduct, the plaintiff and Amity filed separate motions to reargue. They argued that the plaintiff's due process rights were violated by virtue of the trial court's failure to give notice that Practice Book § 13-15 would be part of the inquiry into the allegations of misconduct and by virtue of the trial court's ultimate finding that the plaintiff had violated rule 3.4 (1) in failing to comply with Practice Book § 13-15. The trial court denied those motions, but did respond to the plaintiff's and Amity's due process claims.

In a memorandum of decision on the motions to reargue, the trial court concluded that the plaintiff had "ample notice that a discovery issue was the genesis of [the] misconduct proceeding." The trial court reasoned that the order and notice regarding the hearing on the allegations of misconduct sufficiently informed the plaintiff "that the [trial] court [had] intended to consider all relevant rules of practice and professional misconduct that might underlie a violation of rule 3.4." The trial court noted that, prior to the hearing on the allega-

tions of misconduct, Atlas and another defendant in the Amity-Atlas litigation submitted memoranda and affidavits that included references to the plaintiff's failure to comply with Practice Book § 13-15. The trial court further noted that, in a posthearing memorandum, Atlas and another defendant in the Amity-Atlas litigation argued that the plaintiff had flouted her continuing duty to disclose under Practice Book § 13-15. The trial court also noted that Amity had referred to the plaintiff's continuing discovery obligation in Amity's own posthearing memorandum. Lastly, the trial court observed that, during the posthearing oral arguments, "neither [the plaintiff] nor Amity asserted any objection to . . . claims that the [plaintiff's] alleged misconduct constituted a breach . . . of the continuing duty to disclose under Practice Book § 13-15, and evidenced a violation of [r]ule 3.4 (1) under the facts of th[e] case."

Thereafter, all of the defendants in the Amity-Atlas litigation advocated for the disqualification of the plaintiff and her associates as counsel to Amity in the pending litigation and for the imposition of attorney's fees, costs and other remedial action. Amity implored the trial court not to impose sanctions against it and not to impose any sanction on the plaintiff that would interfere with Amity's ability to proceed in the Amity-Atlas litigation. Furthermore, the plaintiff requested that no sanction be imposed upon her. Alternatively, the plaintiff requested that, in the event that the trial court felt compelled to impose a sanction, it be limited to an admonition.

In a separate memorandum of decision addressing the issue of the proper sanction to be imposed, the trial court ordered that the plaintiff be "disqualified from participating directly or indirectly in any litigation relating to [Amity], including [the Amity-Atlas litigation and] any claim by individuals that they have become ill as

a result of defects in the [high school] building." This writ of error followed.[9]

In her writ of error, the plaintiff alleges that the trial court had insufficient evidence on which to base its findings that she had violated subdivisions (1) and (6) of rule 3.4, and, thus, that the trial court improperly disciplined her. The plaintiff seeks to have the trial court's findings that the plaintiff violated rule 3.4 (1) and (6) and the resulting disqualification order reversed and set aside.

After the plaintiff had filed the writ of error with this court, Judge McWeeny moved to dismiss for lack of subject matter jurisdiction. Judge McWeeny argued that the plaintiff was not aggrieved by the disqualification order and, therefore, did not have standing to pursue a writ of error. Judge McWeeny also argued that the disqualification order was not a final judgment from which the plaintiff could appeal. Conversely, the plaintiff argued that she was aggrieved because her disqualification was a sanction imposed in connection with a finding of professional misconduct. The plaintiff argued further that, in pursuing the writ of error, she was attempting to vindicate her professional reputation.[10] We denied the motion to dismiss without prejudice, allowing Judge McWeeny to renew his jurisdictional claims in his brief and at oral argument before this court.

[9] The plaintiff also appealed from the trial court's disqualification order to the Appellate Court. The Appellate Court dismissed the appeal. We thereafter denied the plaintiff's petition for certification to appeal from the Appellate Court's order dismissing the plaintiff's appeal, concluding that "a writ of error is the proper vehicle by which this court may consider the nonparty attorney's claim." *Amity Regional School District No. 5* v. *Atlas Construction Co.*, 258 Conn. 923, 782 A.2d 1241 (2001).

[10] In her reply brief, the plaintiff explained that her objective in filing the writ of error was "to clear her name and record as a member of the [b]ar, and not to be reinstated in her counselship to Amity . . . ."

I

We first address Judge McWeeny's jurisdictional claims because they challenge this court's subject matter jurisdiction over the plaintiff's writ of error. See *Johnson* v. *Commissioner of Correction*, 258 Conn. 804, 813, 786 A.2d 1091 (2002) (suggesting that court must resolve subject matter jurisdictional issues before considering claims on appeal); see also *Crone* v. *Gill*, 250 Conn. 476, 477 n.1, 736 A.2d 131 (1999) (absence of standing denies court subject matter jurisdiction over claim that forms basis of writ of error). Judge McWeeny argues that the plaintiff lacks standing because she is not aggrieved by the disqualification order. Judge McWeeny further contends that the disqualification order is not a final judgment from which the plaintiff may appeal. We disagree with each of these claims and conclude that the plaintiff's writ of error is properly before us.

A

Judge McWeeny initially argues that the plaintiff was not aggrieved by the disqualification order and, therefore, lacks standing to bring the writ of error. "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless [one] has, in an individual or representative capacity, some real interest in the cause of action . . . . Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved." (Citation omitted; internal quotation marks omitted.) *Crone* v. *Gill*, supra, 250 Conn. 479–80. "The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the

concern of all the members of the community as a whole. Second, the party claiming aggrievement must successfully establish that the specific personal and legal interest has been specially and injuriously affected by the decision. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Citations omitted; internal quotation marks omitted.) *Harris* v. *Zoning Commission*, 259 Conn. 402, 410, 788 A.2d 1239 (2002).

The plaintiff argues that she has a specific legal and personal interest in the disqualification order because it constitutes a sanction based on a finding of professional misconduct. The plaintiff further contends that her disqualification has injured her legal reputation, and, thus, she is entitled to an appellate determination as to whether her due process rights were violated as a result of the disqualification order and concomitant finding that she had engaged in professional misconduct. Relying on *Crone* v. *Gill*, supra, 250 Conn. 476, Judge McWeeny maintains that the only cognizable injury flowing from the disqualification order was the deprivation of Amity's right to counsel of its choice. We agree with the plaintiff and conclude that Judge McWeeny's reliance on *Crone* is misplaced.

In *Crone*, the trial court disqualified an attorney who had been representing a criminal defendant charged with assaulting a former client of the attorney. Id., 477–78. The disqualification order was based upon the potential for a conflict of interest. Id., 478. The attorney challenged the disqualification order by means of a writ of error, which the state's attorney and the trial judge moved to dismiss for lack of subject matter jurisdiction. Id. In support of his claim that he had standing to challenge the disqualification order, the attorney argued that the disqualification order adversely had affected his pecuniary and reputational interests in representing

his client. Id., 480. We concluded, however, that the attorney lacked standing because "an attorney has no cognizable right to represent a particular client . . . ." Id., 479.

Without deciding whether the alleged injuries to the attorney's pecuniary and reputational interests had satisfied the first prong of the test for determining classical aggrievement; id., 480–81; we found unpersuasive the attorney's claim "that his reputation ha[d] been injured because his disqualification was tantamount to a finding of professional misconduct." Id., 481 n.6. We noted that "[t]he trial [judge] . . . cast no aspersions on the [attorney's] conduct or on his professional integrity. Rather, the trial [judge] explained that, in [his] view, the [attorney's] disqualification was necessary to *avoid* any future problems stemming from his cross-examination of his former client . . . . In such circumstances, it is difficult to see how the [attorney's] reputational interest ha[d] been harmed." (Emphasis in original.) Id.

In *Crone*, we held that the attorney did not meet the second prong of the aggrievement test; id., 481; because "the competing interests at stake in a determination regarding the disqualification of an attorney . . . do not embrace any purported right of an attorney to represent [a particular] client." Id., 484; see id. (competing interests in determination of attorney disqualification are "[1] the [former client's] interest in protecting confidential information; [2] the [current client's] interest in freely selecting counsel of [his or her] choice; and [3] the public's interest in the scrupulous administration of justice" [internal quotation marks omitted]). In so holding, we found the reasoning in *Richardson-Merrell Inc.* v. *Koller*, 472 U.S. 424, 105 S. Ct. 2757, 86 L. Ed. 2d 340 (1985), and *Law Offices of Seymour M. Chase, P.C.* v. *Federal Communications Commission*, 843 F.2d 517 (D.C. Cir. 1988), persuasive.

Our conclusion in *Crone* also stemmed from our concern that interlocutory judicial review of disqualification orders based on a conflict of interest "would be inimical to the interests of the client, the opposing party and the public." *Crone* v. *Gill*, supra, 250 Conn. 484. We specifically referred to the criminal defendant's right to a speedy trial under the sixth amendment to the United States constitution and the interests of the defendant and the community in the prompt adjudication of criminal charges as factors militating against allowing a disqualified attorney to obtain interlocutory review of a disqualification order. Id., 484–85. We concluded, therefore, that, although a criminal defendant may challenge his attorney's disqualification in an appeal from an adverse final judgment; see id., 485–86; the disqualified attorney "has no direct, personal remedy." Id., 486.

The writ of error presently before us is distinguishable from the writ of error in *Crone* in several important respects. With respect to the present case, it is of great consequence that the plaintiff's disqualification was based on professional misconduct, not on a conflict of interest, and that the trial court intended the order as a *sanction* against the plaintiff for such misconduct.[11]

---

[11] The trial court's disqualification order provides in relevant part: "As a sanction for her violation of [Rule] of Professional Conduct 3.4 (1) and (6), [the plaintiff] is disqualified from participating directly or indirectly in any litigation relating to . . . Amity . . . including this case as well as any claim by individuals that they have become ill as a result of defects in the [high school] building. Following a transitional period not to exceed sixty . . . days from the date of this order, [the plaintiff] also is prohibited from consulting with Amity regarding any such litigation. In the interim transition[al] period, [the plaintiff] may consult with new counsel for Amity to facilitate such counsel's assumption of the responsibility to represent Amity. The court declines to order costs or attorney's fees as a sanction for [the plaintiff's] conduct, nor will additional discovery orders enter."

According to the plaintiff, the trial court subsequently forwarded the disqualification order to the statewide grievance committee, which, in turn, forwarded the order to the Office of Lawyer's Professional Responsibility in Minnesota, another state in which the plaintiff is a member of the bar. According to the plaintiff, the Office of Lawyer's Professional Responsibility

Inasmuch as the plaintiff's disqualification constituted a sanction, we disagree with Judge McWeeny's contention that the only cognizable injury resulting from the plaintiff's disqualification is the deprivation of Amity's right to counsel of its choice.

It is settled law in Connecticut that a sanction for professional misconduct adversely affects an attorney's vested right to practice law. See, e.g., *Lewis* v. *Statewide Grievance Committee*, 235 Conn. 693, 705, 669 A.2d 1202 (1996); *Statewide Grievance Committee* v. *Shlugar*, 230 Conn. 668, 675, 646 A.2d 781 (1994); see also *Kucej* v. *Statewide Grievance Committee*, 239 Conn. 449, 462, 686 A.2d 110 (1996), cert. denied, 520 U.S. 1276, 117 S. Ct. 2457, 138 L. Ed. 2d 214 (1997) ("a license to practice law is a vested property interest"). Thus, "attorneys subject to disciplinary proceedings are entitled to due process of law." *Statewide Grievance Committee* v. *Botwick*, 226 Conn. 299, 306, 627 A.2d 901 (1993). We traditionally have recognized that the right to appellate review of an order imposing sanctions is part and parcel of those due process rights accorded to a disciplined attorney. See, e.g., *Thalheim* v. *Greenwich*, 256 Conn. 628, 634–36, 775 A.2d 947 (2001) (sanction requiring attorney to read rules of practice challenged by means of writ of error); *Haymond* v. *Statewide Grievance Committee*, 247 Conn. 436, 437, 723 A.2d 808 (1999) (appeal of reprimand); *Somers* v. *Statewide Grievance Committee*, 245 Conn. 277, 278, 715 A.2d 712 (1998) (same); *Lewis* v. *Statewide Grievance Committee*, supra, 696–97 (same); *Statewide Grievance Committee* v. *Shlugar*, supra, 669 (appeal of suspension from practice of law); *Statewide Grievance Committee* v. *Botwick*, supra, 300–301 (appeal of suspension from practice of law and reprimand). We discern no good reason to treat the plaintiff's

has stayed any action with respect to the plaintiff's conduct pending the outcome of the plaintiff's writ of error.

disqualification predicated on her violation of subdivisions (1) and (6) of rule 3.4 any differently from any other sanction imposed on the basis of professional misconduct. Cf. Practice Book § 2-38 (a) (granting disciplined attorney right to appeal from decision of statewide grievance committee). In each instance, the findings of misconduct that underlie the sanction affect the attorney's right to practice law. We, therefore, conclude that the plaintiff has standing to challenge her disqualification.

B

Judge McWeeny next claims that the disqualification order is an interlocutory order from which the plaintiff may not appeal. Pursuant to the rules of practice, "[w]rits of error for errors in matters of law only may be brought from a *final judgment* of the superior court to the supreme court." (Emphasis added.) Practice Book § 72-1 (a); accord General Statutes § 52-272; *State v. Salmon*, 250 Conn. 147, 158, 735 A.2d 333 (1999). We recognize, however, that "[a]n otherwise interlocutory order is appealable in two circumstances: (1) whe[n] the order or action terminates a separate and distinct proceeding, or (2) whe[n] the order or action so concludes the rights of the parties that further proceedings cannot affect them." (Internal quotation marks omitted.) *State v. Malcolm*, 257 Conn. 653, 657, 778 A.2d 134 (2001), quoting *State v. Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983). "Unless the appeal is authorized under the *Curcio* criteria, absence of a final judgment is a jurisdictional defect that [necessarily] results in a dismissal of the appeal." (Internal quotation marks omitted.) *Ruggiero v. Fuessenich*, 237 Conn. 339, 345, 676 A.2d 1367 (1996).

Judge McWeeny argues that the disqualification order in the present case does not fall within either prong of the *Curcio* test because disqualification orders often

turn on and may be intertwined with the particular facts in the underlying litigation. Judge McWeeny further contends that the plaintiff's appeal is premature because Amity may win at trial and, thus, render the plaintiff's appeal unnecessary. We conclude that the disqualification order meets the first prong of the *Curcio* test.

"The first prong of the *Curcio* test, termination of a separate and distinct proceeding, requires that the order being appealed from be severable from the central cause of action so that the main action can proceed independent of the ancillary proceeding." (Internal quotation marks omitted.) *Burger & Burger, Inc.* v. *Murren,* 202 Conn. 660, 664, 522 A.2d 812 (1987). As we previously noted in this opinion, the trial court carved out a separate and distinct proceeding at which it addressed the allegations of professional misconduct. Following a hearing on the allegations of misconduct, which lasted several days, the trial court rendered a decision in which it found that the plaintiff had violated subdivisions (1) and (6) of rule 3.4 of the Rules of Professional Conduct. Thereafter, the trial court ordered that the plaintiff be "disqualified from participating directly or indirectly in any litigation relating to [Amity], including th[e] [Amity-Atlas litigation] . . . ." The fact that the Amity-Atlas litigation had continued notwithstanding the plaintiff's disqualification also evidences the severability of the disqualification order from the underlying litigation.[12]

Judge McWeeny nonetheless contends that the plaintiff's misconduct was so intertwined with the central issue in the Amity-Atlas litigation, namely, the cause of the moisture conditions at the high school, that the disqualification order could not be considered separate and distinct from the main proceeding. Judge McWee-

---

[12] We note that Amity's action against Atlas and other contractors, the action from which the plaintiff's writ of error arose, and Atlas' separate action against Amity both were settled and withdrawn subsequent to oral argument before this court on the plaintiff's writ of error.

ny's contention rests on an objection that the plaintiff's counsel, Ralph G. Elliot, raised with respect to certain questions regarding the accuracy of Benassi's report, which opposing counsel asked Miller, the plaintiff's paralegal, at the hearing on the allegations of misconduct.[13] The focus of the misconduct proceeding, how-

---

[13] Judge McWeeny specifically refers to Elliot's objection to questions about Miller's statements in paragraph eleven of her affidavit, which provides: "At the [September 12, 2000] meeting, [the plaintiff] informed . . . DiSpazio that Amity believed Benassi's report to be problematic because (1) the Report had not been requested or otherwise authorized by Amity to our knowledge, (2) the Report contained inaccurate information and assumptions about the condition, history and maintenance procedures of the High School, and (3) the Report reached erroneous conclusions about the condition and maintenance of the High School. Additionally, we feared that if the report was revealed to [the] press with the noted inaccuracies, it would potentially result in additional negative public attention directed [toward] both Amity and its individual board members."

On the second day of the hearing on the allegations of the plaintiff's misconduct, opposing counsel in the Amity-Atlas litigation cross-examined Miller regarding the foregoing statements in her affidavit. The following colloquy involving Miller, Elliot, Thomas H. Connell, opposing counsel, and Judge McWeeny occurred.

"[Connell]: . . . You now get to [paragraph] number eleven, and you come to the meeting of September 12. You say [the plaintiff] informed . . . DiSpazio that Amity believed the reports to be problematic, and then you give three examples of that. And one of them is number two, the report contained inaccurate information and assumptions about the condition, history and maintenance procedures of the high school. Do you remember that?

"[Miller]: Yes, sir.

"[Connell]: Do you remember what [the plaintiff] said more specifically?

"[Miller]: I remember it. Yes, sir.

"[Connell]: What was inaccurate and what were the incorrect or inaccurate information and assumptions? What were they?

"[Miller]: I think it would be a breach of my ethics to be repeating—

"[Elliot]: . . . Your Honor, we're going to object to that. This is the very reason [the plaintiff] didn't want that conversation disclosed, because it deals with strategy in this litigation. It deals with work product. It deals with what she's doing. They may not know of it that she's entitled to do for her client as part of her representation.

"[Connell]: I'm not asking, Your Honor, about strategy. I'm asking facts. It says inaccurate information and assumptions in . . . Benassi['s] report. I'm not asking about—they say they didn't authorize it. They didn't—it's not correct. I'd like to know what's wrong with it.

ever, was not on whether Benassi's report was accurate or whether the plaintiff was justified in challenging the report's accuracy. Rather, the focus of the proceeding was limited to whether the plaintiff had attempted to alter, destroy or conceal Benassi's report, a document with potential evidentiary value in the Amity-Atlas litigation. The fact that the sanction took effect immediately, as opposed to being delayed until the end of trial, further counsels against a finding that the disqualification order was so intertwined with the underlying proceeding. We, therefore, find Judge McWeeny's argument without merit.[14] We now turn our attention to the merits of the plaintiff's writ of error.

"[Elliot]: Well—

"The Court: Well, that's a different—I mean, whether—

"[Connell]: [Miller] puts it in her affidavit, Your Honor. Why can't I cross-examine on it?

"[Elliot]: Your Honor, I think the time may very well come when in other parts of this litigation with which, happily, I will not be involved in which those questions may be appropriate, but at this point, first of all, it is irrelevant whether there's anything inaccurate in the report. It's [the plaintiff's] belief that there was, and she discussed this with . . . DiSpazio in an attempt to get him to understand the problem that that report caused. Whether she was right or wrong is irrelevant. It is part of the strategy that she was using and is using in this litigation, and it was for that very reason, as . . . DiSpazio, himself, testified, that she said I don't want this conversation to go out of this room.

"[Connell]: I'm not asking about her work product. I'm not asking about anything that she might have disclosed to a client. We have a third party here, and we have an affidavit that the statement was made—

"The Court: Well, why do you need it in the context of this hearing?

"[Connell]: I'm trying to check credibility.

"[Elliot]: Well, the credibility question is whether she said anything at all, not what she said.

"The Court: All right. You can ask her if she discussed details about the report.

"[Connell]: Did [the plaintiff] discuss details contained in . . . Benassi['s] report in front of or with . . . DiSpazio?

"[Miller]: Yes, she did."

[14] Judge McWeeny further argues that the plaintiff cannot satisfy the second prong of *Curcio* because subsequent events at trial, including the possibility that Amity may obtain a satisfactory judgment, could render an appeal of the disqualification order unnecessary. In light of our conclusion that the

## II

The plaintiff claims that her due process rights were violated inasmuch as she was provided with no notice before the misconduct hearing that her failure to comply with Practice Book § 13-15 could form the basis of a finding that she had violated rule 3.4 (1). We disagree with this contention.[15]

plaintiff has satisfied the first prong of *Curcio*, we need not decide whether the plaintiff also has satisfied the second prong.

[15] The plaintiff initially raised her due process claim in her motion to reargue, which the trial court denied. In the memorandum of decision regarding the plaintiff's and Amity's separate motions to reargue, the trial court explained: "The moving parties had ample notice that a discovery issue was the genesis of this misconduct proceeding. The notice of hearing . . . specifically reference[d] [r]ule . . . 3.4 [of the Rules of Professional Conduct], and quote[d] that rule of conduct in pertinent part as one implicated by the allegations of misconduct contained in the DiSpazio and Yamin affidavits . . . . It is the court's opinion that the . . . notice . . . sufficiently informed the parties that the court intended to consider all relevant rules of practice and professional conduct that might underlie a violation of rule 3.4. It would have been impractica[l] for the court to articulate at that time each and every Practice Book, Penal Code and statutory obligation that might trigger a violation of this rule of conduct."

The trial court then catalogued the following instances during the proceeding in which the plaintiff's continuing duty to disclose was raised: (1) the prehearing memoranda of certain defendants in the Amity-Atlas litigation referenced the plaintiff's failure to comply with discovery requests in violation of Practice Book § 13-15; (2) the plaintiff discussed the duty to disclose Benassi's report in her prehearing affidavit; (3) certain defendants in the Amity-Atlas litigation filed a posthearing memorandum in which they discussed at length that the plaintiff's failure to disclose the report constituted a violation of Practice Book § 13-15 and that such violation, in turn, constituted misconduct under rule 3.4; (4) Amity's posthearing brief noted Amity's continuing discovery obligations and referenced the plaintiff's affidavit and testimony at the misconduct hearing to explain Amity's intended discovery production schedule; and (5) the plaintiff's and Amity's failure to object to the Amity-Atlas litigation defendants' argument at the posthearing oral argument on sanctions that "the alleged misconduct constituted a breach by Amity and its counsel of the continuing duty to disclose under Practice Book § 13-15 and evidenced a violation of rule 3.4 (1) under the facts of th[e] case." The trial court thereafter concluded that its decision was "not based on a finding of a mere technical timeliness violation of the duty of continuing disclosure. The record instead evidence[d] an unsuccessful but

"At their core, the due process clauses of the state and federal constitutions require that one subject to a significant deprivation of liberty or property must be accorded adequate notice and a meaningful opportunity to be heard. . . . [S]ee *CFM of Connecticut, Inc.* v. *Chowdhury*, 239 Conn. 375, 393, 685 A.2d 1108 (1996) (As a procedural matter, before imposing . . . sanctions, the court must afford . . . a proper hearing on the . . . [proposed] sanctions. . . . There must be fair notice and an opportunity for a hearing on the record. . . .), overruled on other grounds, *State* v. *Salmon*, supra, 250 Conn. 154–55; see also *Statewide Grievance Committee* v. *Botwick*, [supra, 226 Conn. 308] (before [discipline may be imposed], attorney [is] entitled to notice of charges, fair hearing and appeal to court for determination of whether he was deprived of due process). These requirements apply to the imposition of sanctions. See, e.g., *CFM of Connecticut, Inc.* v. *Chowdhury*, supra, 393; *In the Matter of Presnick*, 19 Conn. App. 340, 349–51, 563 A.2d 299, cert. denied, 213 Conn. 801, 567 A.2d 833 (1989)." (Citation omitted; internal quotation marks omitted.) *Thalheim* v. *Greenwich*, supra, 256 Conn. 649.

"In the context of attorney misconduct proceedings, this court previously has stated that notice must be sufficiently intelligible and informing to advise the . . . attorney of the accusation or accusations made against him, to the end that . . . [he] may prepare to meet the charges against him . . . . If this condition is satisfied, so that the accused is fully and fairly apprised of the charge or charges made, the complaint is sufficient to give him an opportunity to be fully and fairly heard . . . . This court also has explained that a hearing such as this is not the trial of a criminal or civil action or suit, but an investigation by the court into the conduct

vigorous attempt to suppress a document (the Benassi report) which had significant evidentiary value."

of one of its own officers, and that, therefore, while the complaint should be sufficiently informing to advise the . . . attorney of the charges made against him, it is not required that it be marked by the same precision of statement, or conformity to the recognized formalities or technicalities of pleadings, as are expected in complaints in civil or criminal actions." (Citation omitted; internal quotation marks omitted.) Id., 649–50.

In *Statewide Grievance Committee* v. *Rozbicki*, 219 Conn. 473, 595 A.2d 819 (1991) (*Rozbicki*), cert. denied, 502 U.S. 1094, 112 S. Ct. 1170, 117 L. Ed. 2d 416 (1992), we noted that a presentment for attorney misconduct need not refer to specific sections of the Code of Professional Responsibility.[16] Id., 476–77 n.3; see also *Thalheim* v. *Greenwich*, supra, 256 Conn. 649–51 (notice lacking reference to particular rule of practice that attorney was found to have violated did not contravene attorney's due process rights). In *Rozbicki*, we reasoned that, "[b]ecause of its sui generis character, the reference to specific rules of professional conduct within the context of a presentment does not, unlike a criminal statute, constitute the only basis for a finding of guilt, but serves rather to assist the trial court in making its own conclusions as to whether, under the totality of the circumstances, professional misconduct has occurred." *Statewide Grievance Committee* v. *Rozbicki*, supra, 476–77 n.3. Thus, in order for a presentment or notice of hearing on attorney misconduct to satisfy due process standards, the presentment or notice must apprise the attorney of the transactions that form the basis of the allegations of misconduct. See id., 484; see also *Statewide Grievance Committee* v. *Botwick*, supra, 226

---

[16] "The Code of Professional Responsibility was repealed on October 1, 1986, at the same time that the current Rules of Professional Conduct, as approved by the judges of the Superior Court, became effective." *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 554 n.15, 663 A.2d 317 (1995).

Conn. 311 (presentment not identifying transaction for which violation was found failed to satisfy due process requirements).

In the present case, the trial court's order regarding the hearing on the allegations of misconduct, which also contained the notice of hearing, clearly stated that the trial court's inquiry would concern the plaintiff's alleged attempts to suppress Benassi's report. See *Statewide Grievance Committee* v. *Botwick*, supra, 226 Conn. 310 (trial court does not have "carte blanche to examine any evidence and find a violation without regard to whether the presentment [gives] the [attorney] adequate notice of the charges against him"). That order also identified the particular parts of the Rules of Professional Conduct that were relevant to the trial court's inquiry. That order and the accompanying notice adequately apprised the plaintiff that her actions involving Benassi's report were at issue.[17]

Our conclusion is supported by the plaintiff's prehearing affidavit that was submitted to the trial court. The substance of the plaintiff's prehearing affidavit evidenced the plaintiff's understanding that her failure to disclose Benassi's report was a central issue at the hearing.[18] Moreover, on the first day of the three day

---

[17] The record discloses that the trial court issued an order regarding the hearing on allegations of misconduct and the accompanying notice of hearing to the plaintiff and all parties to the Amity-Atlas litigation directing them to appear for a hearing on allegations that the plaintiff had attempted to suppress evidence, namely, Benassi's report, which was inimical to Amity's position in the litigation. The order detailed DiSpazio's and Yamin's respective affidavits, which detailed the plaintiff's alleged attempts to suppress the report. The order also cited and quoted subdivisions (1), (2) and (6) of rule 3.4 of the Rules of Professional Conduct.

[18] Paragraph twenty-eight of the plaintiff's affidavit provides in relevant part: "Upon learning that [Benassi's] Report apparently had been authorized, I . . . immediately recognized that it would almost certainly have to be disclosed as part of any discovery response in any case relevant to Amity and . . . fully intended on making it available in all relevant pending litigation in which Amity was involved." Paragraph fifty of the plaintiff's affidavit provides in relevant part: "As noted above, from September [12] forward, I

hearing on the allegations of misconduct, counsel for Atlas specifically argued that the plaintiff had not complied with her continuing duty to disclose discoverable material in failing to disclose Benassi's report in a timely manner.[19] The plaintiff's counsel acknowledged that the plaintiff understood her continuing duty to disclose and

recognized that [Benassi's] Report almost certainly was fully discoverable and, unless research revealed otherwise, I always intended to make it available to all counsel of record in all pending litigation involving Amity."

[19] The following is a colloquy between Thomas G. Librizzi, counsel for Atlas, Elliot, the plaintiff's counsel and Judge McWeeny:

"[Librizzi]: . . . What I would like to offer and ask the court to take judicial notice of are Amity's responses to [certain of the defendants'] interrogatories dated July 13, 1999. These are Amity's responses dated September 30, 1999, as well as . . . Amity's cover sheet to [its] objections to the . . . interrogatories dated July 13, 1999. These are documents signed by [the plaintiff].

\* \* \*

"The Court: Any objection to those?

"[Elliot]: Well, I do have an objection, Your Honor, because as I heard this rather rapid reading, I thought I kept hearing 1999, 1999—these are all 1999 documents. This is a hearing about the . . . DiSpazio [incident] which began and ended in the year 2000. What 1999 documents have to do with this is beyond me and, indeed, beyond the scope of this hearing.

"The Court: Well, let's find out. What's the claim?

"[Librizzi]: The relevance of it, Your Honor, is that [the particular interrogatory] that was filed back in 1999 asked Amity to identify all reports, analyses and tests performed that [relate] in any way to the exterior wall system, fungus or mold at th[e] [high] school. For each such report, analy[sis], or test performed, provide the following data report, name of person or entity that prepared the report and the purposes of the report. So what we are establishing is that there was an obligation, there was always a continuing duty to disclose documents that are responsive to discovery requests. So this was a specific discovery request asking for a report under which the Benassi report fell. And it's part of our theory that that report should have been disclosed and was discoverable when it was prepared. There was a specific document—interrogatory out there that requested the production of reports of this nature.

"The Court: But you've addressed that in your memo[randum], Attorney Elliot, about the continuing duty to disclose.

"[Elliot]: Oh, there is a continuing duty—it exists whether or not these documents are there and indeed the Benassi report has been disclosed, never been—

"The Court: I mean, but I will allow it and—go ahead, you can introduce [it] . . . ."

replied that Benassi's report had been disclosed. We, therefore, reject the plaintiff's claim that the absence of a reference to Practice Book § 13-15 in the order regarding the hearing on the allegations of misconduct and the accompanying notice of hearing constituted a violation of the plaintiff's due process rights.

## III

We next consider the plaintiff's claim that the evidence was insufficient to support the trial court's findings that the plaintiff had violated subdivisions (1) and (6) of rule 3.4. As a preliminary matter, we set forth the standard under which we review the plaintiff's claims of evidentiary insufficiency. "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 737, 756 A.2d 799 (2000). We also must determine whether those facts correctly found are, as a matter of law, sufficient to support the judgment. See, e.g., *Gardner* v. *Balboni*, 218 Conn. 220, 226, 588 A.2d 634 (1991). Although "we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses"; (internal quotation marks omitted) *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 346, 736 A.2d 824 (1999); we will not uphold a factual determination if we are "left with the definite and firm conviction that a mistake has been made." Id.; accord *Leydon* v. *Greenwich*, 257 Conn. 318, 329 n.3, 777 A.2d 552 (2001). Additionally, because the applicable standard of proof for determining whether an attorney has violated the Rules of Professional Conduct is clear and convincing evidence; e.g., *Somers* v. *Statewide Grievance Committee*, supra, 245 Conn. 290; we must con-

sider whether the trial court's decision was based on clear and convincing evidence.[20] "That is the standard and scope of this court's judicial review of decisions of the trial court. Beyond that, we will not go." (Internal quotation marks omitted.) *State* v. *Floyd*, supra, 737.

## A

## Rule 3.4 (1)

Rule 3.4 of the Rules of Professional Conduct provides in relevant part: "A lawyer shall not: (1) Unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value . . . [or] counsel or assist another person to do any such act . . . ." Under the Rules of Professional Conduct, even an attempt at unlawfully obstructing another party's access to evidence or at unlawfully altering, destroying or concealing an evidentiary document constitutes a violation of rule 3.4 (1). See Rules of Professional Conduct 8.4 ("[i]t is professional misconduct for a lawyer to . . . [1] [v]iolate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another"). "[A]s the commentary to rule 3.4 states, the rule is designed to promote '[f]air competition in the adversary system [by] secur[ing] prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructive tactics in discovery procedure, and

[20] " 'Clear and convincing evidence' refers to the quantum of factual proof required for the court to find facts." *Thalheim* v. *Greenwich*, supra, 256 Conn. 651–52. "[C]lear and convincing proof denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *Somers* v. *Statewide Grievance Committee*, supra, 245 Conn. 290–91.

the like.' " *Somers* v. *Statewide Grievance Committee*, supra, 245 Conn. 288.

The trial court found that the plaintiff twice had violated rule 3.4 (1). The first violation occurred when the plaintiff had attempted to have Benassi's report withdrawn or treated as a draft. The second violation occurred when the plaintiff had failed to disclose the report promptly pursuant to her continuing duty to disclose under Practice Book § 13-15. Our extensive review of the record persuades us that the trial court correctly concluded that the plaintiff had violated rule 3.4 (1).

The plaintiff does not dispute the trial court's factual finding that Benassi's report constituted a "document . . . having potential evidentiary value." Rules of Professional Conduct 3.4 (1). In her November 30, 2000 affidavit, the plaintiff attested that, as early as September 12, 2000, she was aware of the report's potential evidentiary value and recognized that it was almost certainly a discoverable document. The plaintiff challenges, however, the sufficiency of the evidence underlying the trial court's findings that she had sought to have DiSpazio withdraw or treat Benassi's report as a draft and that those efforts amounted to an attempt to "alter, destroy or conceal a document . . . having potential evidentiary value." Id. She further challenges the trial court's conclusion that her failure to comply with Practice Book § 13-15 constituted an unlawful obstruction of another party's access to evidence.

Turning to the plaintiff's specific contentions, she initially claims that the trial court ignored the parties' discovery schedule pursuant to which she was not required to disclose Benassi's report until December 6, 2000. The record demonstrates, however, that the trial court was fully aware of the parties' discovery schedule. Not only was the schedule discussed in the plaintiff's pretrial affidavit that she had adopted as her testimony

at the hearing on the allegations of misconduct, but it also was discussed at length in the plaintiff's motion to reargue, which the trial court had denied.

Rather than ignoring the parties' discovery schedule, the trial court instead declined to credit the plaintiff's testimony that she had intended to disclose Benassi's report in accordance with that schedule. The trial court noted in its decision that "[t]he undisputed facts demonstrate . . . that a clearly relevant document that had been presented to [the plaintiff] on August 29, 2000, was not provided to opposing counsel until late October, 2000, and only after its existence was disclosed in a newspaper article." The trial court also found "unpersuasive and self-serving" the plaintiff's explanation that her efforts to have Benassi's report withdrawn were an attempt to shield Amity from embarrassment lest the report could become public pursuant to a freedom of information request.

Additionally, the trial court wholly declined to credit the testimony of Miller, the plaintiff's paralegal, which supported the plaintiff's version of events, because of the inconsistencies in Miller's testimony regarding her affidavit and her demeanor on the witness stand. Specifically, the trial court found "incredible" Miller's testimony that any similarity in language between her affidavit and that of the plaintiff was " 'coincidental.' "[21]

---

[21] A comparison of the relevant paragraphs in the affidavits of the plaintiff and Miller reveals the "nearly identical wording, phrases and progression" that the trial court had observed.

Miller's affidavit: "7. On August 29, 2000, I attended a meeting of the Facilities Committee where they received, for the first time, a copy of a document entitled Amity Senior High School Ceiling System Report, prepared by the DiSpazio Corporation . . . and . . . Benassi . . . . The Report, which discussed purported observations about moisture and other problems potentially affecting the High School's suspended ceiling system, recommended several replacement options for selected tiles, which DiSpazio apparently was capable of implementing. At this time, I did not know who, if anyone, [had] asked DiSpazio and Benassi to prepare the Report since [DiSpazio] had not come through the [Request for Proposal] process [for school district contracts].

The trial court reasoned that any suggestion "[t]hat such duplication would be coincidental is not believable."

\* \* \*

"11. At the meeting, [the plaintiff] informed . . . DiSpazio that Amity believed the Report to be problematic because (1) the Report had not been requested or otherwise authorized by Amity to our knowledge (2) the Report contained inaccurate information and assumptions about the condition, history and maintenance procedures of the High School, and (3) the Report reached erroneous conclusions about the condition and maintenance of the High School. Additionally, we feared that if the Report was revealed to the press with the noted inaccuracies, it would potentially result in additional negative public attention directed [toward] both Amity and its individual board members.

\* \* \*

"13. Also at the meeting, [the plaintiff] noted the letter dated August 21, 2000 from . . . DiSpazio to . . . Keane was unsigned, and had accompanied the Report. The plaintiff asked . . . DiSpazio if the Report was meant to be a draft or final product. . . . DiSpazio informed her that the Report was not a draft to his knowledge and that, as a matter of course, he does not sign his outgoing correspondence.

"14. The plaintiff then asked . . . DiSpazio to withdraw the Report."

The plaintiff's affidavit: "12. On August 29, 2000, I attended a meeting of the Facilities Committee, the primary purpose of which was to vote to approve or deny payment of various contractors' bills. There I received for the first time a copy of a document entitled Amity Senior High School Ceiling System Report prepared and signed by . . . Benassi . . . together with an unsigned transmittal letter from . . . DiSpazio dated August 21, 2000. The Report, which discussed purported observations about moisture and other problems potentially affecting the High School's suspended ceiling system, recommended several replacement options for selected tiles, which DiSpazio apparently was capable of implementing. At that time, I did not know who, if anyone, [had] asked that such a Report be prepared.

\* \* \*

"18. At the meeting, I informed . . . DiSpazio that Amity believed the Report to be problematic because the Report (1) had not been requested or otherwise authorized by Amity, (2) contained inaccurate information and assumptions about the condition and maintenance of the High School, and (3) reached erroneous conclusions about the condition and maintenance of the High School. Additionally, I feared that if the Report, which might be subject to disclosure under the Freedom of Information Act, was revealed to the press with the noted inaccuracies, it would potentially result in additional negative public attention directed [toward] both Amity and its individual board members.

"19. For the reasons noted in . . . this affidavit, I then asked . . . DiSpazio to withdraw the Report.

\* \* \*

It is within the province of the trial court, as the fact finder, "to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Internal quotation marks omitted.) *Potter* v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 224, 694 A.2d 1319 (1997). "Where testimony is conflicting the trier may choose to believe one version over the other . . . as the probative force of the evidence is for the trier to determine." (Internal quotation marks omitted.) *State* v. *Santiago*, 245 Conn. 301, 318, 715 A.2d 1 (1998). "Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom. . . . As a practical matter, it is inappropriate to assess credibility without having watched a witness testify, because demeanor, conduct and other factors are not fully reflected in the cold, printed record." (Citations omitted; internal quotation marks omitted.) *Lewis* v. *Statewide Grievance Committee*, supra, 235 Conn. 709–10 (*Berdon, J.*, concurring). We, therefore, defer to the trial court's credibility assessments and conclude that there was ample evidence in the record to support the trial court's findings and conclusions.

The plaintiff next argues that the trial court ignored the absence of any claim or evidence that the defendants in the Amity-Atlas litigation had requested

"21. Because an unsigned letter dated August 21, 2000, from . . . DiSpazio to . . . Keane had accompanied the Report, I next asked . . . DiSpazio if the Report was meant to be a draft or final product. He informed me that the Report was not a draft and that, as a matter of course, he does not sign his outgoing correspondence."

Benassi's report and that such a request had been denied. She also contends that there was no occasion between August 29 and October 20, 2000, on which the defendants in the Amity-Atlas litigation would have expected the plaintiff to disclose Benassi's report. The record clearly demonstrates, however, that the defendants in the Amity-Atlas litigation had sought Benassi's report on October 11, 2000, the day on which the report was discussed in the New Haven Register article. Counsel for the defendants in the Amity-Atlas litigation specifically made their request pursuant to the continuing duty to disclose and the articulation of damages concept. The plaintiff did not disclose Benassi's report notwithstanding the facts that the plaintiff had understood that the report was discoverable and that the defendants' request was made in anticipation of a hearing on Amity's application for a prejudgment remedy,[22] which was scheduled for October 30, 2000. Instead, the plaintiff responded that "all unprivileged relevant documents will be disclosed in a timely manner." The plaintiff waited until December 6, 2000, the next scheduled date for document delivery, to disclose Benassi's report. The trial court reasonably could have concluded, on the basis of all of the evidence in the record, that, had Yamin not disclosed Benassi's report to the defendants in the Amity-Atlas litigation on October 20, 2000, pursuant to a subpoena directed to the records custodian of DiSpazio Corporation, the defendants effectively would have been denied access to the report in time for the October 30, 2000 prejudgment remedy hearing. We, therefore, find the plaintiff's argument to be without merit.

We further reject the plaintiff's contention that the trial court's conclusion that the plaintiff violated rule

---

[22] See General Statutes § 52-278d (a) (court may grant prejudgment remedy when "plaintiff has shown probable cause that . . . a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought").

3.4 (1) lacks sufficient evidentiary support because her disclosure of Benassi's report on December 6, 2000, did not prejudice any party to the Amity-Atlas litigation. Although the issue of prejudice may be relevant to what sanctions should be imposed as a result of an attorney's misconduct, the absence of prejudice is irrelevant to a determination of whether an attorney has violated rule 3.4 (1). The trial court found, by clear and convincing evidence, that Benassi's report constituted a document with potential evidentiary value and that the plaintiff unlawfully had attempted to alter, destroy or conceal it. The Rules of Professional Conduct require nothing more and we are not inclined to read a prejudice requirement into rule 3.4.

The plaintiff next argues that there was no evidence demonstrating that: (1) she had sought to treat Benassi's report as a draft; (2) she had collected the distributed copies of the report at the August 29, 2000 facilities committee meeting on the basis of the substance of the report; and (3) she had sought to prevent DiSpazio from disclosing the report on the ground of attorney-client confidentiality at the September 12, 2000 meeting and in her September 20, 2000 letter to DiSpazio and Yamin. We find these contentions lacking in merit.

With respect to the plaintiff's contention that there was no evidence demonstrating that she had sought to treat Benassi's report as a draft, DiSpazio testified that, at the September 12, 2000 meeting, the plaintiff "told [him] that she would like to take [Benassi's] report and treat it as a draft and for [him] to rescind it . . . ." DiSpazio testified that, in response, he "asked why, and she told [him] that they have some ongoing litigation, and that was the extent of it, and [that he] basically refused because [he] felt it was a safety issue." Keane, who also was present at the September 12, 2000 meeting, testified that the plaintiff "asked [DiSpazio] about the report, and she said that the report wasn't correct

[and that] there [were] damaging parts [in] it. [The plaintiff] asked [DiSpazio] if he'd put on a draft, write draft on it, and he said no." Yamin also testified that the plaintiff had called him on September 14, 2000, and demanded that DiSpazio instruct Benassi to draft a new report for the plaintiff's review. Additionally, Miller testified that the plaintiff had asked DiSpazio more than once at the September 12, 2000 meeting to withdraw the report.[23]

The plaintiff's contention that there was no evidence demonstrating that the contents of Benassi's report had motivated her to collect all copies of the report distributed at the August 29, 2000 facilities committee meeting is without merit. At the hearing on the allegations of misconduct, Keane testified that Miller had pointed out something in Benassi's report and, in response, the plaintiff immediately collected all copies of the report. Keane further testified that the plaintiff then turned to him and stated that the report was "going to cost her a lot of money." Miller also testified that she had pointed out something in Benassi's report to the plaintiff but that the plaintiff had collected all copies of the report before she had done so. On the basis of the foregoing testimony and additional evidence in the record, the trial court reasonably could have concluded that the contents of Benassi's report motivated the plaintiff to collect all copies of the report at the facilities committee meeting. Whether we might conclude otherwise is irrelevant in the present case "because the fact finder is in the best position to evaluate the evidence and the demeanor of the parties." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Egbarin*, 61 Conn. App. 445, 458, 767 A.2d 732, cert. denied, 255 Conn. 949, 769 A.2d 64 (2001). In the absence of manifest

[23] We note that the testimony of Russell Faroni, the chairman of Amity's facilities committee and a member of the Amity board of education, generally was consistent with the testimony of the other witnesses.

abuse, we, as the reviewing court, must defer to the discretion of the trial court on such matters. See, e.g., *In re Pagano*, 207 Conn. 336, 344, 541 A.2d 104 (1988) ("Judicial discretion is always a legal discretion. Its abuse will not be interfered with on appeal to this court except in a case of manifest abuse and where injustice appears to have been done." [Internal quotation marks omitted.]).

We also find no merit to the plaintiff's contention that the record lacks any evidence that her invocation of the attorney-client privilege was an attempt to prevent DiSpazio from disclosing Benassi's report. In her September 20, 2000 letter to DiSpazio and Yamin, the plaintiff wrote: "Please be advised that we have been notified that the information discussed under attorney-client privilege during our meeting of September 12, 2000 has been brought anonymously to the attention of the press.

"Pursuant to Attorney Yamin's letter of September 12, 2000, we understood that . . . DiSpazio will not release [Benassi's] report to any third parties unless lawfully required to do so.

"Additionally, *I made it very clear in our meeting that [Benassi's report] was not to be discussed with anyone who was not at the meeting.*

"Therefore, we need your client to confirm that he has taken and will continue to take all necessary measures to ensure his compliance with [Amity's] right to confidentiality on this matter. If we do not receive such assurances by close of business today, Amity will take all necessary legal measures to protect its interests." (Emphasis added; internal quotation marks omitted.)

On the basis of this and additional evidence in the record, we conclude that there was sufficient evidence to support the inference that the plaintiff had invoked

the attorney-client privilege in attempting to prevent DiSpazio from disclosing Benassi's report.

Lastly, we are compelled to address the plaintiff's claim that the trial court had failed to cite any decisional law to support its conclusion that an unsuccessful attempt to unlawfully alter, destroy or conceal a document with potential evidentiary value constitutes a violation of rule 3.4 (1). We refer the plaintiff to rule 8.4 (1) of the Rules of Professional Conduct, as the trial court had done in its memorandum of decision on the motions to reargue filed by the plaintiff and Amity. Rule 8.4 of the Rules of Professional Conduct provides in relevant part that "[i]t is professional misconduct for a lawyer to: (1) [v]iolate or *attempt* to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another . . . ." (Emphasis added.) In sum, we conclude that the trial court properly found, by clear and convincing evidence, that the plaintiff had violated rule 3.4 (1) of the Rules of Professional Conduct.

## B

### Rule 3.4 (6)

We now turn to the plaintiff's claim that there is no evidentiary basis for the trial court's conclusion that the plaintiff violated rule 3.4 (6) of the Rules of Professional Conduct. Rule 3.4 of the Rules of Professional Conduct provides in relevant part that "[a] lawyer shall not . . . (6) [r]equest a person other than a client to refrain from voluntarily giving relevant information to another party unless: (A) [t]he person is a relative or an employee or other agent of a client; and (B) [t]he lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information . . . ." The trial court concluded that the plaintiff's instruction to DiSpazio at the September 12, 2000 meeting not to discuss relevant information, e.g., Benassi's

report, with anyone and the plaintiff's subsequent letter to DiSpazio and Yamin reiterating her instruction had constituted a violation of rule 3.4 (6).

In light of our earlier conclusion that there was sufficient evidence in the record demonstrating that the plaintiff had instructed DiSpazio to refrain from discussing Benassi's report with anyone, we need not tarry in addressing the plaintiff's claim in the context of the trial court's finding that her actions also violated rule 3.4 (6). Furthermore, inasmuch as the plaintiff concedes in her brief that Benassi's report would have fallen outside of any protected conversation regarding legal strategy that she may have imparted to DiSpazio at the September 12, 2000 meeting, we need not address her claim that DiSpazio was a former agent of Amity and that her instructions to him related solely to the privileged information that she had disclosed to him.

After a thorough review of the record, we conclude that there was sufficient evidence upon which the trial court could have concluded, by clear and convincing evidence, that the plaintiff had violated subdivisions (1) and (6) of rule 3.4. We further conclude that the facts found are, as a matter of law, sufficient to support the judgment.

## IV

Lastly, we address the plaintiff's claim that the sanction of disqualification was disproportionate to the violations found and, thus, that the trial court abused its discretion in disqualifying the plaintiff. In sanctioning the plaintiff, the trial court was guided by the American Bar Association's Standards for Imposing Lawyer Sanctions (standards).[24] The standards provide that, after a

---

[24] We note that, although the trial court was guided by the American Bar Association's Standards for Imposing Lawyer Sanctions, "[t]he Standards, originally promulgated in 1986, have not formally been adopted by the judges of this state." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Spirer*, 247 Conn. 762, 782 n.13, 725 A.2d 948 (1999).

finding of misconduct, a court should consider: (1) the nature of the duty violated; (2) the attorney's mental state; (3) the potential or actual injury stemming from the attorney's misconduct; and (4) the existence of aggravating or mitigating factors. A.B.A., Standards for Imposing Lawyer Sanctions (1986) standard 3.0, p. 25; see also *Statewide Grievance Committee* v. *Spirer*, 247 Conn. 762, 782, 725 A.2d 948 (1999). The standards list the following as aggravating factors: "(a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; and (j) indifference to making restitution." A.B.A., Standards for Imposing Lawyer Sanctions, supra, standard 9.22, p. 49. The standards list the following as mitigating factors: "(a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical or mental disability or impairment; (i) delay in disciplinary proceedings; (j) interim rehabilitation; (k) imposition of other penalties or sanctions; (*l*) remorse; [and] (m) remoteness of prior offenses." Id., standard 9.32, p. 50.

In considering the nature of the duty imposed, the trial court found that the plaintiff had violated rule 3.4 by suppressing relevant, discoverable evidence to which the opposing parties and their counsel were enti-

tled in accordance with the plaintiff's continuing duty to disclose under Practice Book § 13-15. The trial court also found that the plaintiff was of sound mind at all relevant times. As to the factor addressing the injury caused by the misconduct, the trial court found that the plaintiff's misconduct had caused injury to the defendants in the Amity-Atlas litigation, who were forced "to engage in extensive and costly . . . proceedings [that] ha[d] substantially delayed the progress of the . . . litigation." The trial court also found that the plaintiff's efforts to suppress Benassi's report "undermine[d] the discovery scheme" established by the rules of practice and "the basic integrity of the judicial system." In addressing the presence of aggravating and mitigating factors, the trial court characterized the plaintiff's testimony during the hearing on the allegations of misconduct as "unpersuasive and self-serving" and concluded that the plaintiff had presented a "false defense . . . ." The trial court determined that the plaintiff's refusal to acknowledge any wrongdoing was a substantial factor in the court's consideration of the aggravating factors.

As we previously have noted, "it is not the function of this court to determine the sanction we would have imposed on the [plaintiff had we been] faced with that task." *Statewide Grievance Committee* v. *Spirer*, supra, 247 Conn. 788. In matters of attorney misconduct, "[the trial] court is free to determine in each case, as may seem best in light of the entire record before it, whether a sanction is appropriate and, if so, *what the sanction should be*." (Emphasis in original; internal quotation marks omitted.) *Thalheim* v. *Greenwich*, supra, 256 Conn. 656. "As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate issue for us is whether the trial court could have reason-

ably concluded as it did." (Internal quotation marks omitted.) Id.

In the present case, the trial court found that the plaintiff had attempted to alter, destroy or conceal Benassi's report, a document with potential evidentiary value in the Amity-Atlas litigation, and that she had failed to disclose the report pursuant to her continuing duty to disclose. The trial court further found that the plaintiff had sought to prevent DiSpazio from disclosing the report. The trial court's conclusion that the plaintiff had violated subdivisions (1) and (6) of rule 3.4, therefore, was a consequence of the plaintiff's failed attempts to keep Benassi's report from becoming known to the defendants in the Amity-Atlas litigation. In these circumstances, in which the misconduct involved the plaintiff's attempt to subvert the discovery process, we do not believe that it was unreasonable for the trial court to have disqualified the plaintiff. We conclude, therefore, that the trial court did not abuse its discretion when it ordered that the plaintiff be "disqualified from participating directly or indirectly in any litigation relating to [Amity], including th[e] [Amity-Atlas litigation] . . . ."

The writ of error is dismissed.

In this opinion the other justices concurred.