ARTHUR J. ROCQUE, JR., COMMISSIONER OF ENVIRONMENTAL PROTECTION *v.* LIGHT SOURCES, INC., ET AL.
(SC 17261)

Sullivan, C. J., and Borden, Katz, Palmer and Vertefeuille, Js.

422

Argued February 8—officially released September 13, 2005

*Nicole M. Fournier*, with whom was *Hugh F. Keefe*, for the appellants (defendants).

*Patricia A. Horgan*, assistant attorney general, with whom were *Mary K. Lenehan*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Kimberly P. Massicotte*, assistant attorney general, for the appellee (plaintiff).

*Opinion*

VERTEFEUILLE, J. This appeal arises out of the trial court's judgment ordering the defendants to clean up their contaminated properties and surrounding areas pursuant to state hazardous waste and water pollution control statutes and regulations. The defendants appeal from the trial court's judgment ordering them to remediate areas that had become contaminated with mercury, and assessing civil penalties for their violations of state environmental statutes. The principal issues on appeal are whether the trial court: (1) improperly modified its judgment by lowering the mercury concentration level at which the defendants' cleanup responsibilities were triggered more than four months after rendering the original judgment; (2) improperly determined that the defendants had violated the Water Pollution Control Act (act), General Statutes § 22a-216 et seq., during certain time periods when there was no direct evidence of violations of the act; (3) improperly imposed penalties on the defendants for violations of the act following the initiation of this action and during the time that a

temporary injunction was in effect, despite the defendants' remediation efforts during those periods; (4) assessed excessive penalties for violations of the act when there was no evidence that the defendants' activities were "flagrant and knowing"; *Keeney* v. *L & S Construction*, 226 Conn. 205, 216–17, 626 A.2d 1299 (1993); (5) improperly imposed a $5000 per month penalty for violations of the act at the defendants' property located at 11 Cascade Boulevard in Milford beginning in 1995, when that penalty should have been imposed after the issuance of a temporary injunction in 1999; and (6) assessed excessive penalties for the defendants' violations of state hazardous waste management regulations. We reverse the judgment of the trial court with respect to the defendants' fifth claim and affirm the judgment in all other respects.

The following facts and procedural history are relevant to our resolution of this appeal. The plaintiff, Arthur J. Rocque, Jr., is the commissioner of environmental protection (commissioner) and is charged with the supervision and enforcement of the state's environmental statutes. The defendants, Light Sources, Inc. (Light Sources), LS Neon, Inc. (LS Neon), and LCD Lighting, Inc. (LCD Lighting), were at all times relevant to this action Connecticut corporations in the business of manufacturing fluorescent and specialty light bulbs.[1]

[1] The three defendants involved in this action are related to one another and to the contaminated properties that are the subject of this action. All three corporations are or were engaged in the manufacture of specialty light bulbs. Light Sources was incorporated in 1983. LCD Lighting and LS Neon were incorporated in 1992. All three corporations shared common ownership and functioned in an affiliated manner, which included the sharing of processes, supplies, and record keeping and the joint issuance of financial reports. LS Neon moved its operations to Pennsylvania in July, 1996, and subsequently was dissolved as a Connecticut corporation in April, 2002. LCD Lighting and Light Sources remain in operation currently. Therefore, depending on the periods in question on appeal, either all three corporations or only LCD Lighting and Light Sources are implicated in the discussion. Because the three corporations functioned in an affiliated manner, and for ease of reference, we refer to the three corporate defendants collectively as "the defendants" throughout this opinion.

The defendants operated light bulb manufacturing facilities at 37 Robinson Boulevard in Orange, and at 11 Cascade Boulevard and 70 Cascade Boulevard in Milford.[2]

The defendants' manufacturing process involves coating the insides of light bulbs with phosphor and injecting them with mercury. All of the light bulbs manufactured by the defendants are produced using this process, and, therefore, yield mercury as a waste product. As part of their operations, the defendants are required to dispose of those light bulbs that do not meet their specifications (off-spec bulbs). It is the disposal of these off-spec bulbs that specifically generates the mercury waste that resulted in the contamination of the defendants' properties and surrounding areas in the present case. From the beginning of their operations in 1983, through February, 1994, the defendants disposed of off-spec bulbs in the municipal trash at their manufacturing facilities. After February, 1994, the defendants disposed of the off-spec light bulbs by crushing them in on-site glass compactors. In 1996, the defendants began sending their off-spec bulbs to a lamp recycling company for disposal.

Following discovery of mercury contamination on and around the defendants' properties in 1998,[3] the com-

[2] Light Sources is the record owner of the 70 Cascade Boulevard property. It occupied that property from 1989 until June, 1997, when it relocated its operations to the 37 Robinson Boulevard property. The 70 Cascade Boulevard property is currently unoccupied. The 11 Cascade Boulevard property was leased by LS Neon and LCD Lighting from 1991 to 1997. Since 1997, the 11 Cascade Boulevard property has been owned by an unrelated party. The 37 Robinson Boulevard property is owned by a corporation known as 37 Robinson Boulevard, LLC, and LCD Lighting and Light Sources pay rent to that corporation.

[3] The defendants' properties were first investigated by the department of environmental protection in 1992 and 1993, and again in 1995. Notices of violation citing the defendants' violations of hazardous waste regulations were issued following these investigations. Because the present action arises out of the commissioner's application for a temporary injunction in 1998, however, we do not discuss these earlier investigations in detail.

missioner brought this action against the defendants, alleging violations of the act, as well as violations of the Connecticut Environmental Protection Act, General Statutes § 22a-16 et seq., and § 22a-449 (c)-100 et seq. of the Regulations of Connecticut State Agencies, which govern hazardous waste management. The commissioner sought temporary and permanent injunctions requiring the defendants to remediate the mercury contamination on and around all three sites. Following a hearing in 1999, the trial court issued a temporary injunction requiring the defendants to cease the discharge of mercury and to investigate and mitigate or remediate the resulting pollution on all three sites. In April, 2003, the trial court issued a permanent injunction directing the defendants to remediate all soil and sediments with a mercury concentration of 1 part per million (ppm) or greater to a concentration of 0.2 ppm or less.

The trial court found the following relevant facts with regard to the effects of mercury contamination. Mercury is a toxic substance that poses a serious threat to all living organisms, and, specifically, can have "serious detrimental effects on human health." When combined with organic molecules, mercury becomes a soluble organic compound that can travel easily through water. Mercury is most toxic when it combines with bacteria to form methylmercury, an organic compound that can accumulate easily in the tissues of living organisms. The methylation of mercury is enhanced in marine or salt water environments. Mercury can have an adverse impact on the mortality rates and reproductive abilities of aquatic life. The commissioner has set the acute toxicity standard for mercury for freshwater aquatic life at 0.0021 ppm, and the chronic toxicity standard for freshwater aquatic life at 0.000012 ppm.

The trial court found the following relevant facts specifically with regard to the affected areas. The 70

Cascade Boulevard site is bordered by a wetland area to the west. An unnamed stream crosses the wetland area under Cascade Boulevard and leads to another wetland area, which is an unnamed swamp. The unnamed stream ultimately flows to the Oyster River, approximately five miles from the 70 Cascade Boulevard site. A catch basin in front of the site discharges to the crossing point of the stream and the wetland area under Cascade Boulevard. The 11 Cascade Boulevard site is located one quarter of a mile away from the 70 Cascade Boulevard site. Storm water from the 11 Cascade Boulevard site discharges into a catch basin on that property, which also ultimately empties into the unnamed stream.

The defendants' manufacturing activities caused the sediment in the wetlands and the bodies of water surrounding the 70 Cascade Boulevard site and the 11 Cascade Boulevard site to become contaminated with mercury. The ground and surface water at and around both sites is classified as class GA groundwater and class A surface water, which designates a public or private drinking water supply. The concentration of mercury in the sediment collected from the unnamed stream near the 70 Cascade Boulevard site was 3550 times greater than the background sediment samples collected upgradient of the site. A sample taken from the unnamed stream indicated that the mercury level in the stream was 5 ppm, approximately twice the level of the most contaminated pond in Connecticut. Due to the presence of mercury in the sediment around the Cascade Boulevard sites, every rain storm or other disturbance has caused and will continue to cause mercury to discharge into the surrounding waters. Preliminary testing revealed that mercury is being distributed through the storm water to broader wetland areas. Contaminated sediment on and around the Cascade Boule-

vard sites is an ongoing source of pollution to the wetlands and other bodies of water in those areas.

Fish tissue sampling performed in the unnamed swamp close to the Cascade Boulevard sites revealed "consistently higher levels" of mercury than the levels found from fish tissue sampling conducted downstream of the swamp. In addition, the septic systems at both the 70 Cascade Boulevard and 11 Cascade Boulevard sites contain mercury-bearing sludge, which will continue to be present in the septic systems at both sites until it is removed. Sludge samples taken from the septic tank at the 11 Cascade Boulevard site showed a mercury level of 570 ppm. Sludge samples taken from the septic tank at the 70 Cascade Boulevard site showed mercury levels of 200 and 450 ppm. The highest mercury concentration detected in background sediment samples collected from areas around the 70 Cascade Boulevard site was 0.05 ppm. The mercury waste from the septic systems at both sites discharged into the waters of the state.

The 37 Robinson Boulevard site is bordered on the east by a wetland, and by ponds to the north and south. The bodies of water surrounding the 37 Robinson Boulevard site are also classified as class GA and class A with regard to groundwater and surface water, respectively. The storm water collection system and catch basins on the 37 Robinson Boulevard site discharge into a small pond near the site. The pond discharges into a tributary of the Oyster River. The Oyster River and Long Island Sound are located less then one mile from the 37 Robinson Boulevard site. The defendants' manufacturing activities at that site caused the discharge of mercury into the Oyster River tributary and created a risk of contamination of the Oyster River and Long Island Sound.

The trial court also determined that the defendants had failed to label hazardous waste containers properly,

failed to perform hazardous waste determinations on toxic waste, and failed to distribute copies of a contingency plan to local emergency departments, at all three of its facilities. On the basis of these findings, the trial court determined that the defendants had violated various provisions of the state's water pollution control and hazardous waste management statutes and regulations. For all of these violations, on April 1, 2003, the trial court initially imposed civil penalties totaling $1,059,902.

The trial court twice clarified its decision following the parties' filings of motions for reargument and clarification. Following the trial court's final memorandum of decision on the parties' motions for clarification in December, 2003, in which the court corrected its order and reduced the penalties by $156,000 to a total of $903,902,[4] the defendants appealed from the trial court's

---

[1] The trial court arrived at this figure by calculating separate penalties for each of the defendants' three properties. For each property, the trial court determined a monthly penalty to be assessed for every month that the defendants had engaged in activities in violation of the relevant statute. The monthly penalties assessed on each property increased after a stated point in time. The specific penalty assessments, after modification and clarification by the court, were as follows:

| | |
|---|---|
| 70 Cascade Boulevard property: | 5/90 to 2/99 = 105 months x $1000/month = $105,000 |
| | 3/99 to 6/02 = 39 months x $5000/month = $195,000 |
| | Total penalties for this site = $300,000 |
| 11 Cascade Boulevard property: | 12/92 to 11/95 = 35 months x $2000/month = $70,000 |
| | 12/95 to 3/00 = 51 months x $5000/month = $255,000 |
| | Total penalties for this site = $325,000 |
| 37 Robinson Boulevard property: | 6/97 to 12/99 = 18 months x $5000/month = $90,000 |
| | Hazardous waste violations 3/98 = $92,750 |
| | Total penalties for this site = $182,750 |

The final amount assessed also included $96,152 in costs incurred by the state, which the trial court determined should be borne by the defendants.

judgment to the Appellate Court. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Additional facts will be set forth as necessary.

I

The defendants first claim that the trial court lacked the authority to clarify the decision set forth in its May, 2003 memorandum of decision in December, 2003. Specifically, the defendants claim that because the December decision substantively modified the May decision, and more than four months had passed since the May decision was issued, the trial court had modified the decision in violation of General Statutes § 52-212a.[5] The commissioner contends that the trial court's authority was not limited by § 52-212a because it retained the power to effectuate its prior judgment. We agree with the commissioner.

The following additional procedural history is relevant to our resolution of this claim. The trial court's original memorandum of decision in this action was issued in April, 2003. Both the commissioner and the defendants filed motions for reargument following the filing of that decision. In his motion, the commissioner claimed that the trial court's determination that 0.2 ppm was the correct remediation standard for mercury was inconsistent with the court's order, which required the removal of mercury contamination only at points

[5] General Statutes § 52-212a provides in relevant part: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed. . . . The parties may waive the provisions of this section or otherwise submit to the jurisdiction of the court, provided the filing of an amended petition for termination of parental rights does not constitute a waiver of the provisions of this section or a submission to the jurisdiction of the court to reopen a judgment terminating parental rights."

exceeding 1 ppm. The commissioner therefore sought an amendment of the trial court's decision reflecting the correct remediation standard. The defendants opposed the commissioner's motion for reargument claiming that the commissioner was using its claim to cloak its dissatisfaction with the trial court's order. Additionally, the defendants filed their own motion for reargument on the grounds that the penalties assessed by the trial court were excessive and unsupported by the evidence. The commissioner filed an objection to the defendants' motion for reargument claiming that the evidence sufficiently supported the trial court's assessment of penalties for the defendants' violations on the three sites in question.

In its May, 2003 memorandum of decision on the motions for reargument, the trial court clarified several elements of its April memorandum of decision. First, the trial court reduced the originally assessed penalty amount with respect to one of the defendants' properties. See footnote 4 of this opinion. Second, the trial court directed that "[t]he defendant[s] shall identify all sediment polluted by mercury at a concentration of 1 ppm total mass based concentration or greater. All sediment polluted by mercury at a concentration of 0.2 ppm or more shall be remediated to 0.2 ppm or less. All soil located within one foot of the ground surface, which soil is polluted by mercury in a concentration of 0.2 ppm or greater shall be remediated to a concentration of 0.2 ppm or less." The parties subsequently filed motions for clarification. The commissioner claimed that, while the language of the order required remediation of all sediment polluted at a concentration of 0.2 ppm or more to a level of 0.2 ppm or less, it did not require identification of sediment at this level. Specifically, the order only required the defendants to identify "all sediment polluted by mercury at a concentration of 1 ppm total mass based concentration or greater."

The order therefore did not explicitly require the identification of sediment polluted at a concentration greater than 0.2 ppm but less than 1 ppm. Because the identification of polluted sediment is an implicit prerequisite to its remediation, the commissioner sought clarification of this inconsistency between mandated levels of identification and remediation. The defendants sought clarification of whether the penalty imposed had actually been reduced in the trial court's May, 2003 memorandum of decision, and on the specifics of the revised remediation order.

The trial court issued its memorandum of decision on the motions for clarification in December, 2003, clarifying the remediation order as follows: "*All* sediment polluted by mercury at a concentration of 0.2 ppm or more shall be remediated to 0.2 ppm or less. *All* soil located within one foot of the ground surface, which soil is polluted by mercury in a concentration of 0.2 ppm or greater shall be remediated to a concentration 0.2 ppm or less." (Emphasis added.) The trial court also clarified that its May, 2003 decision contained a mathematical error with respect to the penalties imposed on the 70 Cascade Boulevard facility. With this procedural history in mind, we turn to the defendants' claim.

As a preliminary matter, we set forth the applicable standard of review. At issue in the present case is the question of the court's authority to open and clarify a prior ruling by issuing a modification. The issue of the court's authority to act is a question of law. *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, 260 Conn. 232, 239–40, 796 A.2d 1164 (2002). Our review is, therefore, plenary. Id., 240.

It is well established that a court's ability to modify a prior ruling ordinarily is limited by statute. Specifically, under § 52-212a, "a civil judgment or decree rendered

in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed." The statute also provides, however, that this four month limitation is not applicable "in such cases in which the court has continuing jurisdiction . . . ." General Statutes § 52-212a. The continuing jurisdiction exception to the four month rule is rooted in a court's interest in preserving the integrity of its judgments. Specifically, this court previously has recognized that it is within the equitable powers of the trial court to "fashion whatever orders [are] required to protect the integrity of [its original] judgment." (Internal quotation marks omitted.) *Commissioner of Health Services* v. *Youth Challenge of Greater Hartford, Inc.*, 219 Conn. 657, 670, 594 A.2d 958 (1991). A court's continuing jurisdiction derives from these equitable powers.

We examined the foundations of the continuing jurisdiction exception in *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, supra, 260 Conn. 232. In that case, we stated that "the trial court's continuing jurisdiction is not separate from, but, rather, *derives* from, its equitable authority to vindicate judgments." (Emphasis in original.) Id., 241. We further stated that "the trial court's continuing jurisdiction to effectuate its prior judgments, either by summarily ordering compliance with a clear judgment or by interpreting an ambiguous judgment and entering orders to effectuate the judgment as interpreted, is grounded in its inherent powers . . . ." Id., 246. It is well established that an injunctive order may be modified pursuant to these inherent powers. *Adams* v. *Vaill*, 158 Conn. 478, 482, 262 A.2d 169 (1969).

When we apply these principles to the present case, it is clear that the trial court properly modified its injunctive order pursuant to the continuing jurisdiction exception set forth in § 52-212a. Specifically, the ruling

sought to be modified is indisputably an injunctive order, thus placing it squarely in the category of rulings that courts may modify pursuant to their inherent powers. Pursuant to *Adams*, the modification of injunctive orders is permitted where circumstances warrant such a modification. Id. Such circumstances clearly existed in the present case. Specifically, the trial court's May, 2003 decision contained an inconsistency, which, without clarification, would have rendered it impossible for the trial court to implement its order in accordance with its factual findings. The trial court found in its original April, 2003 order that sediment contaminated with mercury at concentrations higher than 0.2 ppm is hazardous to human health and therefore must be remediated to a concentration of 0.2 ppm or lower. In the trial court's May, 2003 memorandum of decision, however, the trial court's remediation orders were unclear. In that decision, the trial court directed the defendants to remediate *all* sediment contaminated by mercury to a level of 0.2 ppm or less, while only ordering the defendants to *identify* contaminated sediment with a mercury concentration of 1 ppm or higher. Pursuant to the May decision, therefore, sediment contaminated with mercury at a concentration above 0.2 ppm but below 1 ppm was not required to be identified, but was required to be remediated. Because identification of contaminated sediment is an implicit precursor to its remediation, this ambiguity left unresolved the question of whether sediment contaminated at a concentration greater than 0.2 ppm but less than 1 ppm was required to be identified and remediated. Absent clarification of this discrepancy, the trial court would have been unable to effectuate the underlying objective of its original judgment, which was to reduce mercury concentrations on the defendants' properties to a concentration at or below 0.2 ppm.

In response to the parties' motions for clarification concerning this ambiguity, the trial court rendered its

December, 2003 decision, which clarified that "[a]ll sediment polluted by mercury at a concentration of 0.2 ppm or more shall be remediated to a concentration of 0.2 ppm or less." The December decision, therefore, allowed the trial court to effectuate its original judgment by clarifying the specifics of its remediation order to the defendants. Because this clarification was essential to the trial court's ability to vindicate its judgment, we conclude that the trial court properly clarified its May, 2003 decision in its December, 2003 decision pursuant to its continuing jurisdiction over the injunctive order.[6]

## II

The defendants next claim that the trial court improperly determined that the defendants had violated the act on the three sites in question for a period of time during which there was no direct evidence of violations. Specifically, the defendants claim that the trial court assessed penalties for their mere occupancy of the three sites when there was no evidence that they had engaged in activities leading to mercury contamination on those sites for the time period in question. The commissioner counters that the trial court properly assessed penalties by inferring that the defendants had violated the act based on the evidence before it. We agree with the commissioner.

As a preliminary matter, we set forth the standard of review. Because the defendants do not challenge any of the trial court's factual findings in the present case, we must determine only whether "[the] facts [as] correctly found [by the trial court] are, as a matter of law,

---

[6] Because we conclude that the trial court properly clarified its May, 2003 decision pursuant to its continuing jurisdiction over the injunctive order, we need not address the issue of whether the defendants' filing of a motion for clarification constituted a waiver of their right to assert the four month rule of § 52-212a as a bar to opening the judgment.

sufficient to support the judgment." *Briggs* v. *McWeeny*, 260 Conn. 296, 322, 796 A.2d 516 (2003). "Although we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . we will not uphold a factual determination if we are left with the definite and firm conviction that a mistake has been made." (Citation omitted; internal quotation marks omitted.) Id.

Before addressing the defendants' claims, we review the relevant statute. General Statutes § 22a-430 (a), a provision of the act, provides in relevant part that "[n]o person or municipality shall initiate, create, originate or maintain any discharge of water, substance or material into the waters of the state without a permit for such discharge issued by the commissioner. . . ." The purpose of the act is to protect the waters of the state from pollution. *BEC Corp.* v. *Dept. of Environmental Protection*, 256 Conn. 602, 622, 775 A.2d 928 (2001).

A

Because the defendants' first two claims both concern violations found to have occurred prior to October, 1995, we consider them together. The defendants claim that the trial court improperly determined that they had violated the act at the 70 Cascade Boulevard facility and at the 11 Cascade Boulevard facility for the period from May, 1990, to October, 1995, because there was no direct evidence of violations at these facilities prior to October, 1995. Specifically, the defendants claim that the trial court improperly based its finding of violations of the act on the defendants' mere occupancy of the sites in question during the pre-1995 period and not on the defendants' actual activities leading to mercury contamination during that period. The commissioner counters that the trial court logically and properly inferred from the defendants' occupancy of the sites in

question and from other evidence before it that the defendants had been violating the act during the pre-1995 period. We agree with the commissioner.

The following additional facts are relevant to our resolution of this claim. The defendants first occupied the 11 Cascade Boulevard site in 1992 and the 70 Cascade Boulevard site in 1989. The department of environmental protection (department) first investigated the sites in 1992 and at that time issued notices of violations citing the defendants for violations of hazardous waste regulations with respect to the two Cascade Boulevard properties.

In support of its conclusion that the defendants had violated the act at the two Cascade Boulevard facilities prior to 1995, the trial court found that, "[the defendants] operate[d] at all three sites manufacturing specialized fluorescent light bulbs by coating the inside of the bulbs with phosphor and injecting them with mercury." The trial court found the following facts specifically with respect to the 70 Cascade Boulevard facility. "Light Sources operated the facility . . . for nine years and used mercury in its processes during that period of time." It also found that "[t]he prior occupant of that site was a roller skating rink which did not use mercury. . . . During the period from 1990 to May, 2002, [the department] issued no permits for the discharge of water, substance, or other material to the waters of the state for 70 Cascade [Boulevard] nor did it permit for the discharge of mercury or other pollutants to the septic system at the 70 Cascade [Boulevard] site. Mercury waste was discharged from 70 Cascade [Boulevard] to the waters of the state. The mercury found in the sediment of the unnamed stream is attributable to 70 Cascade [Boulevard]."

The trial court found the following facts specifically with respect to the 11 Cascade Boulevard facility. The

defendants manufactured phosphor-coated light bulbs at that facility beginning in 1992. The department issued no permits for any discharge into the waters of the state between 1990 and 2002 for the 11 Cascade Boulevard site.

The trial court therefore found that mercury waste was discharged into the waters of the state from both the 70 Cascade Boulevard and the 11 Cascade Boulevard sites as a result of the defendants' manufacturing process. The defendants do not dispute these factual findings on appeal. From these facts, the trial court inferred that the defendants had been violating the act since they first occupied the sites in question for the purpose of manufacturing light bulbs containing mercury. In responding to the defendants' claims in their motion for reargument that there was insufficient evidence for the trial court to conclude that they had violated the act for the time periods in question, the trial court stated that "the evidence shows that the defendants occupied the [70 Cascade Boulevard] site from 1989 to June 7, 1997, and that during that time it was in the light bulb manufacturing business." With respect to the 11 Cascade Boulevard site, the trial court stated that "[t]here were never any permits issued [regarding] this site." Although the trial court did not specifically state in its memorandum of decision that it was inferring the improper discharge of mercury, an examination of the entire record in the present case clearly indicates that the trial court properly and reasonably inferred the violations from the evidence before it.[7]

---

[7] In the transcript of the hearing on the parties' cross motions for clarification, the trial court specifically referred to drawing such an inference:

"The Court: It wasn't just that they operated the property, was it, that they occupied, they also operated their fluorescent light factory there, didn't they?

"[The Defendants' Counsel]: They were manufacturing light bulbs.

"The Court: So if we have manufacturing in other areas and they turn up a lot of mercury, can't the court just infer that this one . . . had mercury too?"

It is well established that a trial court is permitted to draw reasonable inferences from available facts. *Canepari* v. *Townshend*, 142 Conn. 477, 479, 115 A.2d 432 (1955). In the present case, the trial judge reasonably inferred that because the defendants' manufacturing processes necessarily yielded mercury as a waste product, because the defendants had engaged in these processes from the beginning of their occupancy of the sites in question, and because the record contained no evidence that the defendants properly had disposed of mercury during the pre-1995 period, that the defendants had been violating the act since they first occupied the two Cascade Boulevard sites prior to 1995.

## B

The defendants next claim that the trial court abused its discretion in assessing penalties for violations of the act at the 37 Robinson Boulevard facility between June, 1997, and February, 1998, because there was no direct evidence of violations of the act at the facility prior to March, 1998. The commissioner counters that the trial court drew a reasonable and logical inference, based on the evidence before it, that the defendants' methods of operation at the 37 Robinson Boulevard site had resulted in violations of the act since shortly after it began operations at that site in June, 1997. We agree with the commissioner.

In support of its conclusion that the defendants had violated the act between June, 1997, and February, 1998, at the 37 Robinson Boulevard site, the trial court found the following facts. The defendants first occupied the site in May, 1997. None of the former occupants of the site used mercury in their processes. The defendants failed to secure a permit to discharge waste into the waters of the state pursuant to the act prior to July, 1998. "Waste oil from the vacuum pump at the 37 Robinson [Boulevard] site was sampled in November, 1997, and

found to have a mercury level of 1690 ppm. The roof where [the] pump discharge[s] contains piping which discharges to the on-site storm water system. . . . A sample of mop strands taken [from the 37 Robinson Boulevard site] on March 21, 1998, indicated that the mercury level of the mop strands was 185 ppm. There were floor drains at the facility in several locations which discharge to the sanitation sewer. The storm water collection system at the south of 37 Robinson [Boulevard] and the catch basins behind the building discharge to a small pond at the south of the property. . . . Mercury waste was discharged from the 37 Robinson [Boulevard] site to the waters of the state."

As we previously have stated herein, the trial court is permitted to draw reasonable inferences from available facts. *Canepari* v. *Townshend*, supra, 142 Conn. 479. In the present case, the trial court found that the defendants had been operating at the 37 Robinson Boulevard site since June, 1997, and that a November, 1997 department assessment revealed a high concentration of mercury on various parts of the property that ultimately discharged into the water supply. From those facts, the trial court inferred that the contamination of the property with mercury began in June, 1997, shortly after the defendants first occupied the 37 Robinson Boulevard site. We do not find the trial court's conclusion that the violations began in June, 1997, based on the discovery of mercury contamination in November, 1997, to be the inferential leap suggested by the defendants. The trial court reasonably concluded based on the available evidence that the defendants had been violating the act at the 37 Robinson Boulevard site since June, 1997.

### III

The defendants next claim that the trial court improperly assessed penalties for violations of the act during: (1) the interim period between the institution of this

action in July, 1998, and the issuance of the temporary injunction in March, 1999; and (2) the time period during which the temporary injunction was in effect, specifically, March, 1999, to April, 2003. The defendants claim that during those time periods, they were acting pursuant to the court's interim orders to begin remediation measures, and that the penalties should therefore be reduced or eliminated. With respect to their second claim, the defendants specifically contend that they remediated the affected areas to the level set forth in the temporary injunction, and that, they therefore should not be penalized for violations during that time period simply because the remediation standard established in the permanent injunction order was more stringent than the standard set forth in the temporary injunction. The commissioner counters that there is no authority supporting the defendants' contention that penalties should be reduced or eliminated for the time periods in question. The commissioner further asserts that the trial court's factual findings support the assessment of penalties for continuing violations during those time periods. Additionally, the commissioner counters that to eliminate the penalties during this time period for the defendants would result in unfairly rewarding the defendants for belated compliance with environmental statutes, and would place companies already complying with environmental statutes at a competitive disadvantage. The commissioner finally avers that the trial court in fact considered the defendants' remediation efforts in assessing civil penalties. We agree with the commissioner.

As a preliminary matter, we set forth the applicable standard of review. The trial court imposed the penalties in question pursuant to General Statutes § 22a-438, which endows the trial court with the discretion to assess penalties for violations of environmental statutes. We therefore review the trial court's imposition

of civil penalties to determine whether it abused its discretion in ordering the penalties. "When reviewing claims under an abuse of discretion standard, the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . ." (Internal quotation marks omitted.) *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 274, 819 A.2d 773 (2003). With these principles in mind, we examine the defendants' claim.

Pursuant to § 22a-438, the trial court is permitted to assess penalties against parties who have violated the act. In assessing such penalties, the trial court is guided by the following factors: "[T]he nature, circumstances, extent and gravity of the violation, the person or municipality's prior history of violations, the economic benefit resulting to the person or municipality from the violation, and such other factors deemed appropriate by the court." General Statutes § 22a-438 (a). Additionally, § 22a-438 (a) provides that "[t]he court shall consider the status of a person or municipality as a persistent violator. . . ."

In the present case, the trial court made factual findings consistent with these factors. Specifically, the trial court found that mercury in the water and sediment impairs the natural resources of the state, adversely affects human health, and produces negative reproductive effects and death in aquatic organisms. The trial court further found that the production of methylmercury, "an organic compound produced by the action of bacteria, is substantially more toxic than other forms of mercury" due to its ability to easily accumulate in the tissues of living organisms, and that this methylation process is enhanced in aquatic environments. In addition, the trial court noted that, though the defendants had made some effort to remediate the contaminated areas during the pendency of this action, they had not

fully complied with the temporary injunction during the interim remediation period. Specifically, the trial court found that the defendants had failed to submit reports describing the existing extent of the contamination, failed to define the boundaries of the pollution and to provide analysis of the data in submitted reports, failed to evaluate alternatives for remedial action, and failed to submit a proposed remediation plan for the northern and southern wetlands as required by the temporary injunction order. Finally, the trial court termed the defendants' violations to be "serious" and "ongoing" and noted that the defendants had benefited economically from their violations.

It is evident from these findings that the trial court considered the relevant statutory factors set forth in § 22a-438 in assessing the penalties for the defendants' violations of the act. There is nothing in the trial court's explanation of its penalty assessment that indicates that it considered improper or irrelevant factors in reaching its decision. Moreover, our research does not reveal any authority, nor have the defendants cited any, that would require the trial court to excuse them from penalties during the pendency of the proceedings or during interim remediation. In addition, we note that under the penalty scheme set forth in § 22a-438, penalties up to $25,000 *per day* per offense may be assessed for violations of the act.[8] In the present case, the trial court assessed a maximum penalty of $5000 *per month* for each of the three sites during certain time periods. On the basis of the trial court's findings and because the trial court was authorized by statute to assess substantially greater penalties than it did, we do not find that

[8] General Statutes § 22a-438 (a) provides in relevant part: "Any person who or municipality which violates any provision of this chapter . . . shall be assessed a civil penalty not to exceed twenty-five thousand dollars, to be fixed by the court, for each offense. Each violation shall be a separate and distinct offense and, in case of a continuing violation, each day's continuance thereof shall be deemed to be a separate and distinct offense. . . ."

the $5000 per month assessment was so excessive as to constitute an abuse of discretion. We therefore conclude that the trial court did not abuse its discretion in assessing the penalties that it did for the time periods at issue.

IV

The defendants next claim that the penalties imposed by the trial court for their violations of the act on all three sites were excessive and constituted an abuse of the trial court's discretion because there was no evidence that the mercury contamination resulted from the defendants' " 'knowing and flagrant' " activities. Specifically, the defendants claim that they allowed the department "unfettered access" to the three sites in question and that they complied with every department demand until the initiation of this action in 1998. We find the defendants' claim to be without merit. As we previously have stated herein, we review a trial court's assessment of civil penalties under an abuse of discretion standard.

In view of the aforementioned statutory factors that guide the trial court in assessing civil penalties for violations of the act; see part III of this opinion; it is clear that the intent underlying the violations is not a consideration in assessing such penalties. The defendants offer no authority, nor does our research reveal any, suggesting that a trial court must consider a violating party's intentions when assessing penalties for violations of the act. Moreover, we previously have determined that the act approaches a strict liability scheme, where a party's fault or intent is not considered in determining liability and assessing penalties for violations. See *Starr* v. *Commissioner of Environmental Protection*, 226 Conn. 358, 395, 627 A.2d 1296 (1993). The defendants' claim misperceives the statutory scheme of the act. The fact that the defendants may

have permitted the department "unfettered access" to their sites is of no import. In assessing penalties for the defendants' violations, the trial court set forth the relevant statutory factors and weighed them in a manner yielding a reasonable result. See part III of this opinion. Accordingly, we conclude that the trial court did not abuse its discretion by failing to consider the defendants' intent in assessing penalties for their violations of the act.

V

The defendants next claim that the trial court improperly failed to change the inception date for the maximum $5000 per month penalty imposed with respect to the 11 Cascade Boulevard facility. Specifically, the defendants claim that the $5000 per month penalty that the trial court imposed for violations of the act at the 11 Cascade Boulevard facility should have been assessed beginning with the issuance of the temporary injunction on March 23, 1999, and the lower, $2000 per month penalty should have been assessed from December, 1992, to March 23, 1999. The defendants claim that such an inception date would be consistent with the trial court's previous modification of penalties with respect to the 70 Cascade Boulevard facility. The commissioner responds that the trial court properly assessed penalties for 11 Cascade Boulevard on the basis of the evidence before it. The commissioner specifically asserts the trial court properly assessed the penalties on 11 Cascade Boulevard in view of its finding of ongoing mercury contamination at the site. We agree with the defendants. As we previously have stated herein, we review a trial court's assessment of civil penalties for violations of the act under an abuse of discretion standard.

The following additional facts are relevant to our resolution of this claim. In its April, 2003 memorandum of decision, the trial court originally assessed the fol-

lowing penalties for violations of the act at the 11 Cascade Boulevard facility: a penalty of $2000 per month from December, 1992, to November, 1995, and a penalty of $5000 per month from December, 1995, to March, 2000. The trial court originally assessed the following penalties for violations at the 70 Cascade Boulevard facility: $1000 per month from May, 1990, to November, 1995; and $5000 per month from December, 1995, to June, 2002.

The defendants subsequently filed a motion for reargument with respect to the penalties imposed, claiming that they should not be assessed the higher penalty amount of $5000 per month until after the issuance of the temporary injunction in March, 1999. In its May, 2003 memorandum of decision on the defendants' motion for reargument, the trial court corrected its penalty assessment with respect to the 70 Cascade Boulevard property, stating that "[t]he temporary injunction took effect March 23, 1999, and thus it is from that date [that] the $5000 per month penalty should apply . . . . This correction requires the court to extend the $1000 [per month] penalty [for] . . . thirty-nine months . . . ." In addressing the penalties with respect to the 11 Cascade Boulevard facility in the same memorandum of decision, the trial court stated that "[a]s to the penalties, this court will follow its own reasoning as set forth in part I [of the memorandum, which addressed penalties for the 70 Cascade Boulevard facility] and thus the penalties [for the 11 Cascade Boulevard site] must remain the same."

It is evident to us that the trial court's statement with regard to 11 Cascade Boulevard that it would "follow its own reasoning" with regard to 70 Cascade Boulevard is inconsistent with its directive that the penalties for the 11 Cascade Boulevard facility remain the same. Specifically, the trial court's reasoning in reducing the penalty for the 70 Cascade Boulevard facility was that

the defendants should not pay the higher penalty until after the issuance of the temporary injunction. Applying this same reasoning to the penalties imposed for the 11 Cascade Boulevard facility, as the trial court intended, would require that the $5000 per month penalty be imposed beginning in March, 1999, the date the temporary injunction issued, as was the case with the 70 Cascade Boulevard facility. The trial court, however, inexplicably directed that the penalties with respect to the 11 Cascade Boulevard facility remain the same.

When we review a trial court's assessment of penalties for abuse of discretion, every presumption is made in favor of the trial court's decision. *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, supra, 263 Conn. 274. In the present case, however, we must conclude, based on the trial court's expressed intent that its reasoning with respect to its modification of the 70 Cascade Boulevard assessment should apply to the penalties imposed with regard to the 11 Cascade Boulevard facility, that the inception date for the $5000 monthly penalty for 11 Cascade Boulevard should be changed to March 23, 1999, consistent with the same date for 70 Cascade Boulevard. Accordingly, we conclude that the trial court abused its discretion in failing to modify, in its May, 2003 memorandum of decision, the penalty schedule regarding the 11 Cascade Boulevard facility in this regard.

VI

The defendants' final contention is that the trial court abused its discretion in imposing a $92,750 penalty for the defendants' violations of state hazardous waste management regulations at the 37 Robinson Boulevard site. The defendants rely solely on *Holbrook* v. *Birken Mfg. Co.*, Superior Court, judicial district of Hartford, Docket No. CV 960566306S (August 3, 2000), for authority to support their claim. The defendants claim that

the defendant in *Holbrook* was assessed only $18,500 in penalties for violations similar to those at issue in the present case. The commissioner contends that the regulations in question are intended to prevent harm to the environment, and in light of the trial court's findings that the mercury contamination caused direct harm to the environment, the trial court properly assessed penalties for the defendants' violations. We agree with the commissioner.

As a preliminary matter, we state the standard of review. As is the case with penalties assessed under the act, the trial court is permitted broad discretion in assessing civil penalties for violation of hazardous waste management regulations. We therefore review this claim under an abuse of discretion standard.

The following additional facts are relevant to our resolution of this claim. The trial court found that the defendants had violated several hazardous waste management regulations with respect to the 37 Robinson Boulevard site. Specifically, the trial court found that the defendants had violated § 22a-449 (c)-102 (a) (1) of the Regulations of Connecticut State Agencies by failing to conduct hazardous waste determinations on all waste streams generated at the site. The court further found that the defendants had violated § 22a-449 (c)-110 (a) (1) of the Regulations of Connecticut State Agencies for treating hazardous waste without a permit, and § 22a-449 (c)-102 (a) (2) (C) of the Regulations of Connecticut State Agencies for failure to label hazardous waste containers properly. Finally, the trial court found that the defendants had violated § 22a-449 (c)-102 (a) (1) and (b) (2) of the Regulations of Connecticut State Agencies for failure to distribute copies of the contingency plan to required personnel, and failure to inspect equipment properly, respectively. For these violations, the trial court assessed a total penalty of $92,750.

In determining the amount of civil penalties to assess for violations of state hazardous waste management regulations, the court is guided by General Statutes §§ 22a-131 and 22a-438 (a). Section 22a-131 provides in relevant part that, "[a]ny person who violates any provision of the state's hazardous waste program shall be assessed a civil penalty of not more than twenty-five thousand dollars for each day such violation continues. . . ." As previously stated herein, § 22a-438 (a) also lists specific factors to guide the court in assessing civil penalties, including "the nature, circumstances, extent and gravity of the violation, the person or municipality's prior history of violations, the economic benefit resulting to the person or municipality from the violation, and such other factors deemed appropriate by the court. . . ." Section 22a-438 (a) further provides that "[t]he court shall consider the status of a person or municipality as a persistent violator. . . ." With these factors in mind, we turn to the trial court's memorandum of decision.

In assessing penalties for the defendants' violations of hazardous waste management regulations, the trial court determined that, by failing to dispose of hazardous wastes properly, the defendants had created a risk of releasing toxic waste fumes into the atmosphere. The trial court further determined that the defendants' failure to label hazardous waste containers properly had created the risk of exposing persons to toxic material without their knowledge.

These and other findings demonstrate the trial court's consideration of the relevant statutory factors set forth previously. We conclude that the trial court acted well within its discretion in employing these factors to guide its ultimate penalty assessment. We also note that the trial court was authorized to assess penalties of up to $25,000 per violation per day for each violation under § 22a-131. In the present case, the defendants violated

five different statutory provisions and the trial court therefore was authorized to assess up to $125,000 in penalties per day. Where the total amount assessed for a series of *ongoing* violations does not rise to the statutorily authorized amount for *one day* of violations, and given the trial court's factual findings, we cannot conclude that the $92,750 penalty for these ongoing multiple violations was so excessive as to constitute an abuse of discretion by the trial court. Based on the trial court's consideration of the relevant statutory factors, its findings that mercury is a toxic substance posing a serious risk to human health and other living organisms, and the authorized $25,000 per day per violation cap on civil penalties, the trial court reasonably assessed $92,750 for the defendants' ongoing violations of state hazardous waste regulations.

We further conclude that the defendants' reliance on *Holbrook* is misplaced. The assessment of civil penalties is a fact-specific and broadly discretionary determination. As a result, the penalties assessed in one case have little value for purposes of determining the propriety of the penalties assessed in another case.

The judgment is reversed in part, with regard to the penalties imposed on the 11 Cascade Boulevard site from 1995 to 2000, and the case is remanded with direction to render judgment setting the total penalties for that site at $208,000, to be calculated as follows: $2000 per month from December, 1992, to February, 1999; $5000 per month from March, 1999, to March, 2000. The judgment is affirmed in all other respects.

In this opinion the other justices concurred.