# NIPMUC PROPERTIES, LLC *v.* PDC-EL PASO MERIDEN, LLC, ET AL.
## (AC 26895)

Flynn, C. J., and Gruendel and Harper, Js.

Argued April 30—officially released August 7, 2007

*Genevieve P. Salvatore*, with whom, on the brief, was *Dominic J. Aprile*, for the appellant (plaintiff).

*Bryan L. LeClerc*, with whom were *Elizabeth J. Stewart*, *Deborah Leigh Moore* and, on the brief, *Aimee L. Hoben* and *John H. Gorman*, for the appellees (defendants).

*Opinion*

GRUENDEL, J. In this contract interpretation action, the plaintiff, Nipmuc Properties, LLC, appeals from the judgment of the trial court denying its claim for a declaratory judgment against the defendants, PDC-El Paso Meriden, LLC (PDC-El Paso), Meriden Gas Turbines, LLC (Meriden Gas Turbines), Thomas P. Cadden, trustee of the 1998 Real Estate Trust, and the city of Meriden (Meriden), for the delivery of a lease held in escrow. On appeal, the plaintiff claims that the court improperly construed the contract to include provisions not agreed to by the parties and made findings that were unsupported by the record.[1] We affirm the judgment of the trial court.

The record reveals the following relevant facts as set forth by the court in its memorandum of decision. "The plaintiff held title to a parcel of land comprised of approximately 845 acres along the Metacomet ridgeline in . . . Meriden and Berlin. Due to the size and nature of the parcel, as well as its proximity to the Algonquin gas pipeline, the land became the subject of a proposal to build a 544 megawatt gas fired electric generation facility in the late 1990s, shortly after [the General

---

[1] Additionally, the plaintiff claims that the court improperly applied General Statutes § 47-19, regarding leases for more than one year, to the present case. Without deciding the propriety of the statute's application, we note that the court's brief discussion of § 47-19, to indicate that the lease had not been recorded, did not affect its determination that a condition precedent for the lease's delivery was not met.

Assembly] enacted legislation deregulating the generation of electric power. In furtherance of this proposal, the plaintiff entered into a contract with Summitwood [Development, LLC, (Summitwood)]. Pursuant to this contract, Summitwood obtained the exclusive right to purchase the property. Summitwood then entered into an agreement to sell the land to PDC-El Paso. PDC-El Paso then initiated the process to obtain permits necessary to build an electric generation facility on this property, including a certificate of environmental compatibility and public need issued by the [Connecticut siting council (siting council)], pursuant to General Statutes § 16-50g et seq. All of the parties to this action understood that the construction of such an electric generation facility involved an extensive permitting process and was ultimately subject to the approval of the [siting council].

"The original purchase and sale agreement called for the buyer, PDC-El Paso, to return thirty acres of the 845 acre parcel to Summitwood after the closing. The intent was for Summitwood to retain this property on behalf of, and for development by the plaintiff, the original owner of the 845 acre parcel. The precise location of the thirty acres was to be determined by the parties at a future date.

"PDC-El Paso was unable to perform its contract to purchase the land from Summitwood, which required closing on the title to the property no later than December 31, 2000. PDC-El Paso was unable to perform the contract in a timely manner primarily because its gas turbine manufacturer could not supply the necessary gas turbines to power the electric generation facility. This problem required a significant change in the design of the facility. All of the parties agreed that this design change required the further consideration and approval by the [siting council].

"With the understanding that PDC-El Paso would default under the contract if it failed to close by December 31, 2000, the parties negotiated an amendment to the purchase and sale agreement, dated December 21, 2000 (amendment). The parties, through their representatives, further memorialized their understanding in a letter dated December 21, 2000 (letter).[2] The interpretation of the language of these full exhibits is of critical importance to the determination of the rights and obligations of the parties to this action.

"Pursuant to the amendment, the parties generally agreed to extend the closing date to January 10, 2001. If the closing occurred on or before this date, the purchase price of $12 million would be reduced by $500,000. The amendment also provided that PDC-El Paso would lease approximately fifty-two acres of the 845 acre parcel back to Summitwood on behalf of the plaintiff. The lease of the fifty-two acre parcel was for a period of ninety-nine years with the possibility of extension for an additional ninety-nine years. This long-term lease of the fifty-two acres replaced the provision in the original agreement in which Summitwood had the right to retain thirty acres on behalf of the plaintiff. None of the parties dispute these provisions in the amendment to the agreement.

"This vigorously negotiated amendment further provided that the lease would be placed in escrow pending

---

[2] During oral argument, the plaintiff's attorney for the first time claimed that the letter was parol evidence that should not have been considered by the court in analyzing the agreement. The issue was neither argued at trial nor briefed on appeal. Despite the suggestion that the plaintiff incorporated the parol evidence argument by including in its appellate brief a discussion of *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 746 A.2d 1277 (2000), we decline to address whether the letter was parol evidence. See *Grimm* v. *Grimm*, 276 Conn. 377, 393, 886 A.2d 391 (2005) ("[i]t is well settled that claims on appeal must be adequately briefed, and cannot be raised for the first time at oral argument before the reviewing court"), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006).

the outcome of [siting council] approval. The specific language of § 2 (a) of the amendment provides that '[t]he Escrow Agent shall deliver the Lease to Summitwood upon the approval of the [siting council] of the Buyer's application to amend the decision and order issued by the [siting council] for the Power Plant described in the Purchase Agreement.' . . .

"In addition to the amendment dated December 21, 2000, the parties further memorialized their agreement in a letter, also dated December 21, 2000. The letter states that 'notwithstanding anything contained in the agreement to the contrary, in the event of a denial by the [siting council] of PDC-El Paso['s] . . . application for approval of the transactions described in Section 2 (a) of the Amendment, the undersigned shall pay to Summitwood the additional sum of Seven Hundred Sixty Thousand ($760,000) Dollars.' Section 2 (a) of the amendment primarily describes the fifty-two acre leaseback agreement, the escrow and the permitted uses of the leasehold property by Summitwood. The letter also describes two circumstances under which the $760,000 payment would not be due to Summitwood: (1) if the siting council 'approves the transactions described in Section 2 (a) of the Amendment,' or (2) 'if no closing occurs.' . . .

"On January 10, 2001, PDC-El Paso assigned all of its rights and obligations under the amended purchase and sale agreement to [Meriden Gas Turbines]. On the same day, [Meriden Gas Turbines] closed on the 845 acre parcel. The [Meriden Gas Turbines] deed indicates that its title is subject to the fifty-two acre lease held in escrow. The lease, however, was not recorded at that time.

"Subsequently, on September 12, 2001, the [siting council] approved the proposed changes to the electric generation facility but rejected the proposed leaseback

of fifty-two acres to Summitwood. Instead, the [siting council] directed that title to the fifty-two acres be donated to Meriden.[3] Despite several public hearings and numerous public records concerning the application for the project, covering the span of several years, the first specific request made to the [siting council] for approval of land to be retained by the plaintiff was made on September 7, 2001. This representation was made just five days prior to its rejection by the [siting council], although correspondence between PDC-El Paso and the plaintiff indicates that this land was identified on a map dated April 26, 2001, and presumably submitted to the [siting council]."[4]

On April 25, 2003, the plaintiff filed an amended complaint, in which it requested that the court "[d]etermine and enter judgment declaring that the [fifty-two acre lease] is valid and in effect . . . ." In addition, it requested that Cadden be directed to deliver the lease, and that the court "[e]nter such further orders and relief as may be necessary and just." On June 27, 2003, PDC-El Paso filed an answer to the plaintiff's amended complaint, and on July 2, 2003, Meriden Gas Turbines filed a separate answer, which included special defenses and a counterclaim.[5] Evidence was presented at a trial to

[3] In response to a question at oral argument, the plaintiff's attorney stated that it was her client's position that the siting council did not have the authority to determine the ownership of the property. The plaintiff did not appeal from the siting council's decision to award the fifty-two acres to Meriden, however, because it was not a party to that proceeding.

[4] Joseph F. Carabetta, a principal of the plaintiff, in an August 22, 2001 facsimile transmittal to Ken Roberts, a PDC-El Paso principal, acknowledged the inclusion of the fifty-two acres on the map: "The . . . April 26, 2001 map you provided to me last night clearly indicates that [approximately fifty-two] acres will be retained by the original owner. You also indicated that this map will be submitted to the siting committee as part of the permitting process. As you know, to retain the [fifty-two] acre parcel is very important."

[5] The special defenses alleged lack of satisfaction of a condition precedent, illegality and collateral estoppel. On October 6, 2004, Meriden filed a separate answer with three special defenses that essentially mirrored those filed by Meriden Gas Turbines.

the court on December 2 and 17, 2004, at the conclusion of which the court ordered the simultaneous filing of posttrial briefs.[6] Final arguments were heard on July 15, 2005, and the court filed a memorandum of decision on August 11, 2005, denying the plaintiff's claim for a declaratory ruling. The court found in favor of the defendants on their first special defense after concluding that the condition precedent for delivery of the lease had not been met. This appeal followed.

The plaintiff contends that the factual findings on which the court relied in rejecting its declaratory judgment action were clearly erroneous. "Whether a contract has been breached ordinarily is a question of fact, subject to the clearly erroneous standard of review." *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 431 n.5, 849 A.2d 382 (2004). Accordingly, "[t]o the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *Maharishi School of Vedic Sciences, Inc. (Connecticut)* v. *Connecticut Constitution Associates Ltd. Partnership*, 260 Conn. 598, 605, 799 A.2d 1027 (2002).

The plaintiff claims that the court improperly construed the contract to include provisions to which the

---

[6] Additionally, the court ordered a schedule for briefs in which the parties were to address whether the siting council should be made a party to the action. Only Meriden argued in favor of the addition of the siting council as a party, and on April 27, 2005, the court ruled that the siting council was not a necessary party.

parties had not agreed. Specifically, it claims that it did not agree that the retained leasehold interest of fifty-two acres was subject to siting council approval. We are not persuaded.

"A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 498, 746 A.2d 1277 (2000).

Because the parties to this action were sophisticated business entities, represented by counsel throughout the negotiating process, the court concluded that if the contract had been clearer regarding the result of a bifurcated decision by the siting council, the case would have been akin to *Tallmadge Bros., Inc.*, in which a presumption of definitiveness of the contract was raised. The court in this case stated in its memorandum of decision: "The question here is whether the parties tied the question of the delivery of the lease to its approval by the [siting council]. In this case, the intensive negotiations of the parties led to language that could have been more clearly expressed.

Neither side was successful in succinctly stating the specific result of a denial of the lease by the [siting council]. . . . Nonetheless, the court finds the letter to be most instructive on the question before the court."

The amendment considered only the approval of the application and lease. Section 2 (a) provides in relevant part: "The Escrow Agent shall deliver the Lease to Summitwood *upon the approval* by the [siting council] of the Buyer's application to amend the decision and order issued by the [siting council] for the Power Plant described in the Purchase Agreement." (Emphasis added.) Although the plaintiff argues that it never agreed that the leasehold interest was subject to siting council approval, the concurrently written letter signed by all parties[7] belies the plaintiff's contention. The letter, "notwithstanding anything contained in the Agreement to the contrary," directly addressed the possibility of the siting council's *denial* of PDC-El Paso's application. Upon such occurrence, it confirmed that the defendants "shall pay to Summitwood the additional sum of Seven Hundred Sixty Thousand ($760,000) Dollars."

The letter continues by specifying that "[n]o additional sums shall be due to Summitwood if the [siting council] approves the transactions described in Section 2 (a) of the Amendment or if no Closing occurs." Because the amendment specifically addressed the fifty-two acres that would be held in escrow for delivery

[7] The court noted that "[t]he amendment is signed by . . . Cadden, trustee of the 1998 real estate trust . . . Carabetta, agent for Summitwood and Thomas Atkins, manager of [PDC-El Paso]. The letter was signed by Cadden and Carabetta in their same capacities, and also by Atkins in his capacity as the 'authorized representative' of 'Power Development Company LLC,'" as well as by other authorized representatives of El Paso Meriden Power Companies I and II. *These parties are essentially the same parties who signed the amendment.* Different PDC-El Paso business entities were used on the letter, compared with the amendment, to ensure that there were economically viable entities tied to the obligations of the letter, since it involved the potential payment of $760,000." (Emphasis added.)

to Summitwood, the letter's reference to "the transactions described in Section 2 (a) of the Amendment" undoubtedly included the lease. As the court noted, "[u]nder either scenario [under which the $760,000 would not be due], Summitwood and the plaintiff would retain an ownership interest in the land in question . . . ."[8]

The plaintiff cites *Tallmadge Bros., Inc.*, for the well settled principle that "[a]lthough parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, *it is not within its power to make a new and different agreement* . . . ." (Emphasis in original; internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, supra, 252 Conn. 506. In this case, however, the letter was signed by all parties, and the court found that "[c]redible evidence was presented to the court that Joseph F. Carabetta, a principal of the plaintiff and agent for Summitwood, clearly understood that the fifty-two acre lease required [siting council] approval. . . . Credible evidence was also presented to the court that Carabetta understood that Meriden's support for the fifty-two acre lease was essential for [siting council] approval and that he personally undertook that responsibility."[9] We decline to revisit the

[8] In its appellate brief, the plaintiff takes issue with the court's observation in a footnote that "[t]he lease of [fifty-two] acres represents approximately 6 percent of the . . . larger 845 acre parcel. The fact that the described payment of $760,000 is also approximately 6 percent of the original purchase price of $12 million cannot easily be ignored or dismissed by the court." The plaintiff's contention that "[a]pparently relying upon this speculation," the court concluded as it did is without merit. We note that the court is at liberty to assess reasonably the evidence before it. *Rocque* v. *Light Sources, Inc.*, 275 Conn. 420, 439, 881 A.2d 230 ("[i]t is well established that a trial court is permitted to draw reasonable inferences from available facts").

[9] In a letter dated September 12, 2001, to Joel M. Rinebold, executive director of the siting council, Carabetta wrote: "Information available to me indicates that the [s]iting [c]ouncil is not being presented with a full disclosure of facts relating to the right of [the plaintiff] to obtain the use under a written lease of approximately [fifty-two] acres of the Meriden portion of the parcel at which the subject electric generating plant is to be erected.

court's credibility determinations. See *Mattson* v. *Mattson*, 74 Conn. App. 242, 246, 811 A.2d 256 (2002). A thorough review of the record supports the court's conclusion that approval by the siting council was a condition precedent to the delivery of the lease, and the court's findings of fact in arriving at that conclusion were not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

"[The plaintiff's] right to obtain the use of a portion of the Meriden part of that property was granted under the original July 15, 1998 agreement under which PDC-El Paso contracted for acquisition of all of the property in Meriden and Berlin. Through an inadvertent error, or by design, or by mistake, that contract interest of [the plaintiff] in and to the [fifty-two] acres was not disclosed by PDC-El Paso to . . . Meriden or to the [s]iting [c]ouncil. In fact, a lease for that [fifty-two] acres, fully executed by all pertinent parties, is presently held in escrow awaiting the delivery to [the plaintiff] upon approval by the siting council of the modification to the planned construction now applied for by PDC-El Paso.

"In view of the foregoing circumstances, it is essential that the siting council give due consideration and support for the [contract] rights of [the plaintiff] to that [fifty-two] acres."